529 F.2d 1251
 The CITY OF SAFETY HARBOR, a Municipal Corp., and Claude
Rigsby, Plaintiffs-Appellants,
v.
William BIRCHFIELD, Herbert Brown, S. Curtis Kiser, Douglas
Roach and Edmund Whitson, Jr., Defendants-Appellees.
 No. 74--3845.
 United States Court of Appeals,
Fifth Circuit.
 April 12, 1976.
 
 William P. O'Malley, Jack F. White, Jr., Clearwater, Fla., for plaintiffs-appellants.
 John Germany, John R. Lawson, Jr., Tampa, Fla., Robert R. Feagin, III, Tallahassee, Fla., for Birchfield, Kiser and Whitson.
 N. S. Gould, Thomas A. Bustin, City Atty., Clearwater, Fla., for Brown.
 John F. Rudy, II, Ted R. Manry, III, Tampa, Fla., for Roach.
 Appeal from the United States District Court for the Middle District of Florida.
 Before GEWIN and AINSWORTH, Circuit Judges, and MARKEY,* Chief judge.
 AINSWORTH, Circuit Judge:
 
 
 1
 This unusual case arises out of the dismissal of a complaint in which the City of Safety Harbor, Florida, and the mayor of that city suing in his capacity as a resident taxpayer, seek damages and appropriate injunctive relief against four Florida legislators[1] and two private individuals for purported violations of provisions of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985 and 1986. In substance, the complaint alleges that the defendants illegally conspired to secure the passage of legislation which operated to impair the obligations of an agreement between Safety Harbor and two other Florida cities, Clearwater and Dunedin. Under this 'Service Area Agreement,' dated February 2, 1970, the municipalities involved agreed to tentative boundaries in surrounding unincorporated areas within which each would plan for the provision of various municipal services. The parties also agreed to avoid and discourage annexation plans not in harmony with the tentative boundaries.
 
 
 2
 The legislation which was the result of the alleged conspiracy annexed a portion of Safety Harbor's agreed upon service area to the City of Clearwater.[2] The District Court dismissed the complaint, holding that the City of Safety Harbor was not a proper party under the provisions of the Civil Rights Act and that defendant legislators were immune from suit.[3] Appellants challenge both of these rulings on appeal, but we agree with the District Court and affirm.
 
 
 3
 The Municipality as a 'Person' under the Civil Rights Act
 
 
 4
 The District Court's holding that the City of Safety Harbor is not a proper party under the Civil Rights Act constitutes a proper extension of the reasoning of recent Supreme Court cases which have established that a municipality is not a 'person' within the meaning of 42 U.S.C. § 1983 when the municipality is sued as a defendant. City of Kenosha v. Bruno, 412 U.S. 507, 513, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109, 116 (1973); Moor v. County of Alameda, 411 U.S. 693, 699--700, 93 S.Ct. 1785, 1790, 36 L.Ed.2d 596, 603--604 (1973); Monroe v. Pape, 365 U.S. 167, 187--92, 81 S.Ct. 473, 484--86, 5 L.Ed.2d 492, 505--507 (1960). Appellants contend that it makes little sense to deny municipal corporations relief under the Civil Rights Act in cases where private individuals could recover. This argument overlooks the significance of the distinction between private persons and public entities in American jurisprudence. Ever since the Supreme Court's landmark decision in Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), it has been apparent that public entities which are political subdivisions of states do not possess constitutional rights, such as the right to be free from state impairment of contractual obligations, in the same sense as private corporations or individuals. 17 U.S. (4 Wheat.) at 660--61, 4 L.Ed. at 664. Such entities are creatures of the state, and possess no rights, privileges or immunities independent of those expressly conferred upon them by the state.[4] Id.; Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015, 1020 (1933); see Railroad Commission v. Los Angeles RR., 280 U.S. 145, 156, 50 S.Ct. 71, 73--74, 74 L.Ed. 234, 329 (1929); Risty v. Chicago, R.I. & P.R.R., 270 U.S. 378, 390, 46 S.Ct. 236, 241, 70 L.Ed. 641, 651 (1926); City of New York v. Richardson, 2 Cir., 1973, 473 F.2d 923, 929, cert. denied sub nom. Lavine v. Lindsay, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973). Thus, in Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923), the Supreme Court held that a city which had obtained its water resources by acquiring a private water company through proper exercise of its proprietary authority could not assert the right to freedom from impairment of contractual obligations because of the difference in the relation of private and public entities to the state.[5] In contrast to private individuals and entities, municipal corporations have repeatedly been denied the right to challenge state legislation allegedly violative of the Federal Constitution. Williams v. Mayor and City Council of Baltimore, supra; Pawhuska v. Pawhuska Oil & Gas Co., 250 U.S. 394, 398, 39 S.Ct. 526, 528, 63 L.Ed. 1054, 1057 (1919) ('as respects grants of political or governmental authority to cities, towns, counties, and the like the legislative power of states is not restrained by the contract clause of the Constitution'); City of New Orleans v. New Orleans Water-Works Co., 142 U.S. 79, 12 S.Ct. 142, 35 L.Ed. 943 (1891).
 
 
 5
 The fact that public entities are not right-holders in the same sense as private parties has particular relevance in determining whether a municipality is a 'person' entitled to bring suit under the 1871 Civil Rights Act. After conducting an exhaustive review of the legislative history of that Act, the Supreme Court in Monroe v. Pape, supra, concluded,
 
 
 6
 . . . the legislation was passed to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.
 
 
 7
 365 U.S. at 180, 81 S.Ct. at 480, 5 L.Ed.2d at 501 (emphasis added). The legislative history as detailed in Monroe makes it clear that congressional concern in passing the Civil Rights Act was to create a federal remedy for private persons seeking redress of violations of their civil rights. This conclusion was reiterated by Justice Marshall in Moor v. County of Alameda, supra:
 
 
 8
 . . . 42 U.S.C. § 1983, which was derived from § 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, was intended to provide private parties a cause of action for abuses of official authority which resulted in the deprivation of constitutional rights, privileges, and immunities.
 
 
 9
 411 U.S. at 699, 93 S.Ct. at 1790, 36 L.Ed.2d at 604 (emphasis added). Accordingly, there is no reason why the Supreme Court's clear holdings in the context of suits against municipal defendants that municipalities are not persons within the meaning of the 1871 Civil Rights Act do not also apply where the municipality seeks to bring suit as plaintiff.
 
 
 10
 This conclusion is particularly appropriate in the present case. Under the Florida Constitution, the power to annex unincorporated territory to established municipalities is vested in the state legislature.[6] If municipalities were held to possess the power to enter into annexation agreements which the state legislature could not 'impair,' municipalities could dictate annexation patterns merely by signing such agreements and the legislature's prerogative in such matters would become meaningless. The Contracts Clause of the United States Constitution, art. 1, § 10, contemplates no such result, and the City of Safety Harbor's effort to predicate a civil rights action on a purported right derived from that clause is without merit.
 
 
 11
 We recognize, with appellants, that there are circumstances in which a state's power over its municipalities and other political subdivisions is limited by federal constitutional constraints. See, e.g., Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (redefinition of city boundaries to exclude black voters held violative of the Fourteenth Amendment); Broughton v. Pensacola, 93 U.S. (23 Wall.) 266, 23 L.Ed. 896 (1876) (modification of municipal boundaries could not impair city's preexisting liabilities on municipal bonds). In such cases, state action has operated to deprive private persons of their constitutional rights. The fact that state action is limited in such contexts provides no support for the proposition that municipalities are endowed with analogous rights that may be asserted against the state in federal civil rights actions.[7]
 
 Legislative Immunity
 
 12
 The legislative immunity issue is controlled by Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). In that case, the Supreme Court held that a state legislator acting within the traditional sphere of legislative activity was immune from suit under the Civil Rights Act of 1871, and that the privilege is not destroyed even where the motivation for the challenged conduct is questionable or unworthy. 341 U.S. at 376--78, 71 S.Ct. at 788--89, 95 L.Ed. at 1027. It is difficult to discern anything nefarious in the conduct alleged in the complaint to have been committed in furtherance of the legislator's purported conspiracy (e.g., voting 'to report House Bill No. 2125 (the annexation bill) out of the . . . House Committee on Community Affairs' and 'vocally urging approval of House Bill No. 2125 by said committee.') Even if the motivation of the legislators in supporting the bill was suspect, however, their conduct was clearly within the traditional sphere of legislative activity and thus immune from a civil rights action in accordance with Tenney. See Imbler v. Pachtman, --- U.S. ---, 96 S.Ct. 984, 47 L.Ed.2d 128, 44 U.S.L.W. 4250, 4253 (1976); Scheuer v. Rhodes, 416 U.S. 232, 243--44, 94 S.Ct. 1683, 1690, 40 L.Ed.2d 90, 100--101 (1974). Whether or not appellants' contentions that the common law doctrine of legislative immunity has not been preserved in Florida are well founded,[8] they fail to circumvent Tenney. Such arguments ignore the fact that Congress preserved the immunity for all state legislators in passing the statutory provisions under which the present action was brought. As Justice Frankfurter stated in his opinion in Tenney,
 
 
 13
 We cannot believe that Congress--itself a staunch advocate of legislative freedom--would impinge on the tradition so well grounded in history and reason (i.e., the tradition of granting immunity to legislators involved in legislative pursuits) by covert inclusion in the general language . . . (of the 1871 Civil Rights Act).
 
 
 14
 341 U.S. at 376, 71 S.Ct. at 788, 95 L.Ed. at 1027. See also Imbler, supra, --- U.S. at ---, 96 S.Ct. at 989, 46 L.Ed.2d at 136, 44 U.S.L.W. at 4253. It is now well-settled that 's 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them.' Imbler, supra, --- U.S. at ---, 96 S.Ct. at 989, 46 L.Ed.2d at 136, 44 U.S.L.W. at 4253 (emphasis added); see Scheuer v. Rhodes, 416 U.S. 232, 242--48, 94 S.Ct. 1683, 1689--91, 40 L.Ed.2d 90, 99--103 (1974); Pierson v. Ray, 386 U.S. 547, 554--55, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288, 294 (1967). The question of the scope of immunity afforded state officials in civil rights actions does not necessarily reflect peculiarities of state law on such issues. Cf. Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). Accordingly, we conclude that the District Court correctly held that the defendant legislators were immune from suit under 42 U.S.C. §§ 1983, 1985, and 1986.
 
 
 15
 AFFIRMED.
 
 
 
 *
 Of the U.S. Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 One of the four legislator defendants, Paul W. Danahey, was dismissed from the suit by stipulation of the parties
 
 
 [2]
 Law of June 30, 1973, ch. 73--434 (1973) Fla.Laws 87
 
 
 [3]
 The Court granted leave to amend the complaint with regard to the legislator defendants on the immunity issue, but plaintiffs apparently chose not to file such an amended complaint
 The Court also held that the complaint contained no allegations of violations of the personal civil rights of the mayor or the class he supposedly represented, but granted leave to amend the complaint in this regard. No amended complaint was ever submitted, and appellants do not appear to have raised this issue on appeal. Inasmuch as there is some confusion, however, as to whether this issue is currently before us, we note that the District Court disposed of it correctly. Neither the mayor nor the citizens he purportedly represented were parties to the Service Area Agreement in their private capacities. With regard to them, the complaint as originally framed alleged no injury in fact, and the private plaintiffs thus failed to establish that they had standing to sue. United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 688--89, 93 S.Ct. 2405, 2416--17, 37 L.Ed.2d 254, 270 (1973); Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Moreover, since no effort was made to comply with the provisions of Fed.R.Civ.P. 23, the complaint provided no basis for treating the mayor as the representative of a class and the action as a class action. See generally 7A C. Wright and A. Miller, Federal Practice and Procedure § 1798 (1972).
 
 
 [4]
 In their reply brief, appellants maintain that several of the contentions of the appellees, including their argument that a creature of the state cannot emasculate the power of its creator by entering into contracts with other creatures of the state, may not be considered on this appeal because appellees failed to raise them by cross-appeal. Appellants rely on the District Court's statement in its dismissal order that the contentions of the defendants, other than those concerning plaintiffs' right to sue under the 1871 Civil Rights Act and legislative immunity, 'were deemed inappropriate for determination on motion to dismiss.' They view this statement as a resolution of the issues involved in their favor, and argue in effect that in the absence of a cross-appeal, this Court may not reconsider the issues thus determined. This line of reasoning not only exaggerates the significance of the quoted statement, but also misconceives the extent to which failure to cross-appeal limits consideration of issues at the appellate level. While an appellee cannot secure alteration or modification of claims decided adversely to him in a lower court without bringing a cross-appeal, he is free to support the judgment secured below with any matter appearing in the record, including contentions, arguments, or theories specifically repudiated by the lower court as a basis for allowing his claim. Dandridge v. Williams, 397 U.S. 471, 475, n. 6, 90 S.Ct. 1153, 1156--57 n. 6, 25 L.Ed.2d 491, 496 (1970); United States v. American Railway Express Co., 265 U.S. 425, 435--36, 44 S.Ct. 560, 564, 68 L.Ed. 1087, 1093 (1924); 9 Moore's Federal Practice P204.11(3), at 932--35 (1975). Accordingly, appellees' failure to cross-appeal does not inhibit our consideration of arguments and theories raised below which support the District Court's dismissal order
 
 
 [5]
 As the Supreme Court stated in Trenton,
 The relations existing between the state and the water company were not the same as those between the state and the city. The company was organized and carried on its business for pecuniary profit. Its rights and property were privately owned and therefore safeguarded by the constitutional provisions here sought to be invoked by the city against the legislation of the state. The city is a political subdivision of the state, created as a convenient agency for the exercise of such of the governmental powers of the state as may be intrusted to it. . . . In the absence of state constitutional provisions safeguarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state. A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges, as it sees fit. However, great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will.
 262 U.S. at 185--87, 43 S.Ct. at 536--37, 67 l.Ed. 937, 940.
 
 
 [6]
 The 1968 Florida Constitution provides:
 Municipal annexation of unincorporated territory, merger of municipalities, and exercise of extra-territorial powers by municipalities shall be as provided by general or special law.
 Fla.Const. art. 8, § 2(c).
 
 
 [7]
 We are also aware of a number of recent cases which have held that a state, suing in a parens patriae capacity on behalf of its citizens, may institute a section 1983 action. Pennsylvania v. Flaherty, W.D.Pa., 1975, 404 F.Supp. 1022, 1024; Pennsylvania v. Glickman, W.D.Pa., 1974, 370 F.Supp. 724, 727--28; see Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center, E.D.Pa., 1973, 356 F.Supp. 500, 505--06. Without expressing any view as to the merits of these cases, we merely note their inapplicability here. The City of Safety Harbor does not enjoy the quasi-sovereign status of a state. Cf. Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 258, 92 S.Ct. 885, 889, 31 L.Ed.2d 184, 190 (1972). As a creature of the state, it is not endowed with the same prerogatives in representing the interests of its residents as is the state in protecting the interests of its citizens, particularly where, as here, city and state level interests may be in conflict
 
 
 [8]
 Despite the fact that Florida is one of the few states which has not included some type of legislative immunity in its state constitution, see Tenney v. Brandhove, 341 U.S. 367, 375 n. 5, 71 S.Ct. 783, 788 n. 5, 95 L.Ed. 1019, 1026 (1951), we view appellants' claim that the common law legislative immunity has not been preserved in Florida with skepticism. Appellants correctly note that the English common law is not binding in Florida when it conflicts with the state's 'policies, institutions, customs, or theory of constitutional rights . . ..' Waller v. First Savings & Trust Co., 1931, 103 Fla. 1025, 138 So. 780, 785. But they fail to provide adequate support for the proposition that the common law doctrine of legislative immunity is inconsistent with Florida laws and institutions. Certainly, no inconsistency can be read into the mere fact that the 1885 and 1968 constitutions fail to mention the immunity. Similarly, we do not read Article III, Section 18 of the 1968 Florida Constitution, which requires the legislature to prescribe a code of ethics prohibiting conflicts of interest between public duty and private interest for all state employees, as a constitutional mandate which is in conflict with the immunity