**CITY OF SOUTH PORTLAND**

v.

**STATE of Maine et al.**

Supreme Judicial Court of Maine.

Argued March 8, 1984.
Decided April 30, 1984.

William H. Dale, Corp. Counsel (orally), South Portland, for plaintiff.

Lowry & Platt, Donald Grey Lowry (orally), Portland, for defendants.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

This action is one in the nature of a suit for accounting malpractice, brought by the City of South Portland against the State of Maine and various officials and other employees of the State Department of Audit. On appeal, the City contends that the Superior Court (Cumberland County) erred by dismissing its complaint, under M.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief could be granted. We deny the City's appeal.

Prior to July 22, 1976, the State Department of Audit, pursuant to 30 M.R.S.A. § 5253 (1978),[1] performed a so-called pos-

---

**1.** 30 M.R.S.A. § 5253 (1978) provides in pertinent part:

Each municipality and quasi-municipal corporation shall have an annual postaudit made of its accounts covering the last complete fiscal year by the State Department of Audit or by a qualified public accountant elected by ballot or, if not so elected, engaged by its officers. The officers shall notify the State Auditor of the name and address of the auditor elected or engaged within 30 days after his election or engagement. The postaudit shall be conducted on the basis of auditing standards and procedures prescribed by the State Auditor.

**1. New postaudit.** When there is dissatisfaction with a postaudit made by a public accountant as shown by a petition signed by at least 10% of the voters of a municipality or village corporation, but in no case more than 1,000, and filed with the State Auditor, he shall order a new postaudit to be made by his department, the expense of which shall be paid by the municipality or village corporation.

. . . .

taudit of the City's accounts for the year 1975. That audit failed to discover an incipient embezzlement scheme set up by the City's finance director, Donald K. Turner. In a five-count complaint founded on theories of contract, tort, and section 1983,[2] the City seeks to recover compensatory damages from both defendant State and its accounting employees in an amount equal to the $289,300.00 that Mr. Turner embezzled from it subsequent to the postaudit, plus the $3,691.29 that the City, pursuant to 30 M.R.S.A. § 5253(4), paid the State as "the expense of its postaudit" for 1975. Under two of the counts, the City also demands punitive damages in the amount of $500,000.

### I. *The Allegations of the City's Complaint*

■ In examining the City's complaint to determine whether it states any claim upon which relief can be granted, we must assume that all of the City's factual allegations are true. *See Haskell v. Phinney,* 460 A.2d 1354, 1359 (Me.1983). In its complaint filed in June 1982, the City alleges the following facts. Mr. Turner, the City's finance director from July 1974 to December 1976, exercised complete control over the City's finances, including the authority to open and close bank accounts in the City's name and to endorse checks in its behalf. In August 1975, Mr. Turner in his official capacity received a United States Treasury check payable to the City in the amount of $289,300, representing a federal reimbursement grant to the City for construction of a waste water treatment facility. Mr. Turner, without ever recording the receipt of the federal funds, invested them in the City's name at Northern National Bank in Presque Isle. Then in early 1976 he made arrangements for the State Department of Audit to perform the postaudit of the City's accounts for the year ended December 31, 1975. On July 22, 1976, the State Auditor issued his final report of the audit that his Department had conducted in accordance with 30 M.R.S.A. § 5253. That State audit failed to discover and report the existence of the $289,300 fund owned by the City, which on both December 31, 1975, and July 22, 1976, remained invested in the City's name at the Presque Isle bank. Nor did the State audit discover or report the previous account receivable in discharge of which the City had received the $289,300 check from the United States Treasury. Subsequent to receiving the final audit report of July 22, 1976, Mr. Turner converted to his own use and benefit the City's investment of $289,300 at the Presque Isle bank, along with the interest earned on it.

The City of South Portland asserts liability in five counts against all of the defendants. The first three counts, which seek to recover as compensatory damages the $289,300 embezzled by Finance Director Turner and the $3,691.29 paid by the City for its 1975 audit, are based on the following legal theories:

*Count I. Contract:* Breach of an agreement, express or implied, to perform the audit with the skill commonly possessed by members of the accounting and auditing profession in good standing.

*Count II. Negligence:* Breach of duty owed to the City to perform the audit with the skill commonly possessed by members of the accounting and auditing profession in good standing.

*Count III. Reckless Misrepresentation of the Status of the City's Accounts.*[3]

---

**4. Expense.** Each municipality and quasi-municipal corporation shall pay the expense of its post-audit.

**A.** The State Auditor shall certify to the Treasurer of State for collection any unpaid balance due the State Department of Audit after a 90-day period from the date of billing has elapsed.

. . . .

*See* 5 M.R.S.A. § 243(3) (1979) (authority of Department of Audit to "perform audits for cities, towns and villages as required by Title 30, sections 5251 to 5253").

**2.** 42 U.S.C. § 1983 (Supp. V 1981).

**3.** On Count III, the City also seeks punitive damages in the amount of $500,000.

The fourth count seeks to recover the $3,691.29 paid to the State for the 1975 audit on a legal theory of unjust enrichment. Finally, by Count V the City seeks, under 42 U.S.C. § 1983, to recover the same sums sought under Counts I–IV, along with attorneys' fees and costs. The City claims that the deficiencies in the State audit, performed under the color of state law, subjected the City to the deprivation of rights secured to it by the Federal Water Pollution Control Act and the United States Constitution.

We agree with the Superior Court that the City of South Portland's complaint does not assert any claim upon which it is entitled to legal relief. To the extent, however, that the Superior Court rejected the claims set forth in the first four counts on the doctrine of sovereign immunity, we have no occasion to reach the question whether the Superior Court correctly applied that doctrine to the case at bar. That is so, because the City's state law claims are in any event foreclosed by a fair reading of the legislature's intent as expressed in 30 M.R.S.A. § 5253.

## II. *The Contract, Tort, Reckeless Misrepresentation, and Unjust Enrichment Claims*

In order to determine whether the four counts of the City's complaint that assert claims under state law survive a 12(b)(6) motion to dismiss, we must determine the legislature's intent in enacting what is now 30 M.R.S.A. § 5253. The following statement of the justices of the Supreme Judicial Court in *Opinion of the Justices*, 133 Me. 532, 535, 178 A. 613, 615 (1935), has direct relevance to our interpretation of section 5253:

> Towns [and cities] are mere agencies of the State. They are purely creatures of the Legislature and their powers and duties are within its control.... [That control] is absolute and all embracing except as expressly or by necessary implication limited by the Constitution.

*See also Baxter v. Waterville Sewerage District*, 146 Me. 211, 79 A.2d 585 (1951); 2 E. McQuillan, *Municipal Corporations* § 4.03 (3d ed. 1979). "Being a creature of statute, [a city or town has] only such powers as [are] conferred by statute expressly or by necessary implication." *Phillips Village Corp. v. Phillips Water Co.*, 104 Me. 103, 106, 71 A. 474, 475 (1908). *See also State v. Rand*, 366 A.2d 183, 189 (Me.1976). Section 5253 is searched in vain for any express grant to a municipality of the right to sue the State or its auditors for loss it incurs because of shortcomings in an audit done by the State Department of Audit. Nor can such a right be fairly inferred from the language and history of section 5253. On the contrary, the clear implication of both the statutory language and the statutory history is that the Maine legislature never intended to give a municipality a cause of action against the State and its employees for accounting malpractice. In section 5253 the legislature has created a prudential governmental structure by which it assures that the financial accounts of towns and cities, in the same way as all other agencies or creatures of the State, are subjected to appropriate auditing scrutiny by the State Auditor. The City does not have a contractual relationship with the State or the individual defendant auditors, and neither the State nor defendant employees owe any legal duty to the City of a nature that is enforceable by the City in a tort action in a court of law.

It is instructive for us to examine the language of section 5253 as originally enacted and to review the context in which that legislative action occurred. The first statute that generally provided for State audits of the accounts of cities and towns was P.L.1923, ch. 161. Under that 1923 law, the State Auditor was directed to audit a city or town's accounts on the municipality's request. *Id.*, § 1. The expenses incurred by the State Auditor in making that audit were in the first instance to be paid by the State and were then to be assessed and collected from the taxpayers of that

city or town in the same manner as state property taxes. *Id.*, § 5.[4]

State auditing of municipal accounts continued on that optional-to-the-municipality basis until 1937, when the legislature mandated that every city or town have an annual audit and install a state-approved system of accounts. The annual audit had to be conducted by the State Department of Audit or by an accountant approved by that department and following the state-prescribed classification of accounts. *See* P.L. 1937, ch. 216, § 1.[5] The 1937 amendment made no change in the original 1923 provision for the State Treasury's collection of the allocated cost of the State audit by an add-on to the state property tax in each audited municipality. In its entire basic content,[6] the statutory arrangement for State audits of municipal accounts that

now survives as section 5253 was in place when the 1937 statute went into effect that summer.

The 1937 law was a preventative measure in recognition of the fact that a significant percentage of Maine towns and cities, estimated at 25% by Senator H.C. Marden and other legislators, had from time to time experienced shortages "due to carelessness in bookkeeping or ignorance or in some cases intentional malfeasance." Legis. Rec. 910 (1937). The same senator noted that "[i]n none of those towns since the adoption of the state system have shortages appeared." *Id.* In response to one senator's objection to the bill as an improper interference with local affairs, *id.* at 909–10, several proponents emphasized the benefit that would accrue from requiring a State audit to the State and the general

---

4. P.L.1923, ch. 161, § 5, which is the forerunner of the present 30 M.R.S.A. § 5253(4), provided in pertinent part:

> The expenses incurred [for the state auditor's conduct of an audit of a municipality's accounts] shall be paid in the first instance by the state; and the treasurer of state shall issue his warrant requiring the assessors of the cities, towns and village corporations concerned to assess a tax to the amount of said expense, and such amounts shall be collected and paid to the treasurer of state in the same manner and subject to the same penalties as state taxes.

This provision remained in substance unchanged until the 1957 general revision of Maine's municipal statutes, P.L.1957, ch. 405, when the cost-sharing arrangement was put into its present form. *Id.*, § 26(IV). *See* 30 M.R.S.A. § 5253(4), quoted in n. 1 above.

5. P.L.1937, ch. 216, § 1 amended R.S. 1930, ch. 5, § 97 to read in full as follows:

> Sec. 97. Annual audit of cities, towns, plantations and village corporations provided for. The municipal officers of every city, town, plantation and village corporation in the state shall have, on or before September 30th, 1938, an audit of its accounts covering the last complete municipal year prior thereto, and shall cause subsequent audits of its accounts to be made annually thereafter, and the parties making said audits shall have access to all necessary papers, books and records. Said audits shall be made either by the state department of audit or by qualified public accountants. The term "qualified" as here used shall be construed to mean that said

> audit shall be conducted by an accountant or auditor whose competency shall be approved by the state auditor. Whenever any city, town, plantation, or village corporation shall have said audit made by a qualified public accountant, instead of the state department of audit, the city, town, plantation, or village corporation clerk shall immediately, upon the employment of such qualified public accountant file the name and address with the state department of audit, and such qualified public accountant shall, within 10 days after making the report of the audit and recommendation to said city, town, plantation or village corporation file a certified copy thereof with the state department of audit on forms which said state department of audit shall prescribe, which said form shall provide for a uniform classification of accounts. Any failure on the part of a qualified public accountant to fulfill the provisions of this section shall result in a new audit to be made by the state department of audit. It shall be the duty of the state department of audit to see that the provisions contained herein are carried out, and if any city, town, plantation or village corporation fails to make provision for an audit of its accounts within the prescribed time, then the state department of audit shall cause said audit to be made.

6. What is now section 5352(1) was in substance added by P.L. 1941, ch. 268, which empowered 10% of the legally qualified voters of any town or city, by petition expressing their dissatisfaction with an outside audit, to require the State Department of Audit to make another audit. *See* n. 1 above.

public, as well as to the towns, pointing out the part played by municipal officials in collecting and remitting the state property tax. *See, e.g., id.* at 911. The required annual State audit was pictured as a deterrent to embezzlement, *see, e.g., id.* at 912, 1162; as a plan "to lock the door before the horse is stolen." *Id.* at 1160. The legislators noted the minor nature of the audit cost allocated to the towns and cities by the State Audit Department, typically running from $15 to $87 for a routine audit. *Id.* at 913, 1161.

The 1937 law did not create a contractual arrangement between the State Department of Audit and the cities and towns of Maine. For neither the Department of Audit nor the municipality was there anything consensual about their relationship. Rather, their auditing relationship was imposed upon both by statutory mandate. Every municipality, over which the legislature had the same all-encompassing control as it had over the State Department of Audit and other public agencies, was required to submit to the State audit, subject only to its option of substituting an audit by an outside professional approved by the State Department and working under the state-prescribed system of accounts. Under the 1937 statute, the State Audit Department was not to engage in a proprietary business of rendering professional service to outsiders at a rate mutually agreed upon by it and its outside "clients." Rather, the Department was ordered by the legislature to audit the accounts of the municipalities as members of the State's own governmental family over which the legislature exercised absolute control. The cost incurred in the municipal audits was merely part of the total operating expense of the State Department of Audit. Under the provisions held over from 1923, the State Treasury collected for each municipal audit done by the Department only the proper allocable part of the Department's total operating expenses (and not the market value of such accounting services, which might be higher or lower); and that recoupment came, not through a direct charge to the audited city or town, but by increasing the amount collected as state taxes from the taxpayers of the affected city or town.[7]

In the context in which the 1937 legislature created the system for municipal audits, it is inconceivable that the State was meant to assume the role of insuring any city or town against the risk of negligent or even reckless oversights by the employees of the State Department of Audit. The legislature made the State auditing facilities available to Maine towns and cities, many if not most of which had no internal auditing facilities, and thereby those municipalities received all the benefit of the deterrence that would result from their officials' knowing that State auditors would be reviewing their financial operations. The legislature certainly never intended at the same time to turn the State Treasury into a "deep pocket" from which a municipality might recover any losses from embezzlements that the State audit failed to detect.

As against the employees of the State Department of Audit, who are here sued in their individual capacities, we also conclude that the legislature never intended a municipality to have a direct right of suit for accounting malpractice. Obviously the City of South Portland has no contractual or unjust enrichment claim against those employees because they *a fortiori* never entered into any contract with the City of South Portland and they never re-

---

7. The allegation in the City's complaint that the $3,691.29 paid by the City for the 1975 postaudit "was fair and reasonable for the work to be performed, was reasonably equivalent to the amount a private auditing or accounting firm would have charged [the City] for said work" is irrelevant in determining the meaning of section 5253. Even if the "expense of its postaudit" by the State Department of Audit, determined on a cost-sharing basis, turned out by happenstance to be reasonably equivalent to what an outside firm would charge for doing the audit, the fact remains that the City is responsible only for an allocable part of the expense incurred by the State Department of Audit.

ceived the $3,691.29 paid by the City to the State Treasury as the shared cost of the audit. Analysis of the second and third counts for negligence and reckless misrepresentation require, however, a bit more analysis.

◼ That analysis must revert to the all-encompassing proposition that a city or town has only such powers as the legislature has conferred upon it expressly or by necessary implication. *See Phillips Village Corp. v. Phillips Water Co.*, 104 Me. 103, 71 A. 474. The reasons for our conclusion that section 5253 does not confer any power upon the City of South Portland to sue the State for auditing malpractice lead us to hold that the City of South Portland also has been given no power to sue the State's employees through whom the State performed the audit ordered by the legislature. Those auditors remain State employees at all times, including the times that they are performing municipal audits. Their employer, the State, could, as it might see fit, take disciplinary action, including perhaps even court action, against its own employees for their professional deficiencies. It would be quite another matter, however, to authorize a suit by a municipality against those auditors. Such suits would wreak havoc upon the State's relations with its existing professional employees and upon its recruitment of others. Those suits if permitted would impose a very real, even though indirect, financial burden upon the State. We cannot conceive that the 1937 legislature, in making available to towns and cities the State auditing facilities on a cost-sharing basis, intended to give the power to those municipalities to disrupt the State's relations with its own employees and to increase the State's indirect, unreimbursed costs. To the contrary, the implication is clear that the legislature withheld completely from the municipalities any right of suit for auditing malpractice by the State Department of Audit.[8]

◼ Here, we are not presented with a situation where the State's auditing employees intentionally turned a blind eye to a known or suspected defalcation or otherwise acted in complicity with the municipal embezzler. Nothing such is alleged in the City of South Portland's complaint. For the malpractice set forth in that complaint, consisting of the employees' alleged negligence and recklessness in conducting and reporting on the State's audit of the City's accounts for 1975, the only remedies available to the public are those that could be pursued by the State if the same oversight had occurred in the State Audit Department's examination of the accounts of any other agency of the State.

In sum, the 1937 statute, perpetuated in section 5253, placed all towns and cities on parity with other state agencies in being subject, as a minimum protection of the public's interest, to annual audits by the State Department of Audit or their equivalent. Maine municipalities were permitted to have the services of the State Department of Audit on merely a cost-sharing basis. Regardless of what power the State might have to discipline or even sue its own employee for auditing malpractice, section 5253 cannot be read to say or imply that the legislature vested any similar power in a city or town. Nothing in the statute or its history suggests that the 1937 legislature imposed upon the State and its auditing employees a responsibility to respond to municipalities in damages for nonintentional audit deficiencies of the kind that an outside accounting firm hired to do the job would undertake. If any municipality wanted the financial responsibility of an accounting firm to back up the results of its annual postaudit, the 1937 statute expressly authorized that municipality to opt out of the state audit (performed on a

---

8. The general provision of 30 M.R.S.A. § 1902 (1978) that the "residents of a municipality are a body corporate which may sue and be sued" merely declares a city's or town's legal capacity. It does not speak to the question whether the City of South Portland has a cause of action for auditing malpractice against the State or its auditors.

cost-sharing basis) and to buy (and pay for) the broader protection of the outside audit. The City fails to show any basis for any of its four state law claims against the State and its auditing employees.

### III. *The Section 1983 Claim*

■ The Superior Court was plainly correct in concluding that the City has not pleaded a set of facts that, if proven, would establish a cause of action under 42 U.S.C. § 1983, the Civil Rights Act of 1871.[9] In *City of Safety Harbor v. Birchfield,* 529 F.2d 1251 (5th Cir.1976), the only case exactly on point that we have found, a municipality was held *not* to be a person entitled to maintain a suit under section 1983.[10] The Fifth Circuit based its interpretation of section 1983 upon "[t]he fact that public entities are not right-holders in the same sense as private parties." *Id.* at 1255. The City of Safety Harbor on appeal had made the same argument as is made before us by the City of South Portland; "that it makes little sense to deny municipal corporations relief under the Civil Rights Act in cases where private individuals could recover." We adopt the Fifth Circuit's answer as our own:

> This argument overlooks the significance of the distinction between private persons and public entities in American jurisprudence.... Such entities are creatures of the state, and possess no rights,

privileges or immunities independent of those expressly conferred upon them by the state.... In contrast to private individuals and entities, municipal corporations have repeatedly been denied the right to challenge state legislation allegedly violative of the Federal Constitution.

*Id.* at 1254 (footnotes and citations omitted). Plaintiff City's argument can be turned right around. It makes little sense to construe the Civil Rights Act of 1871 to subject a state agency, the Department of Audit, to a damage suit by another state agency, the City, for accounting malpractice occurring in the course of the first state agency's review of the second's accounts as mandated by the legislature which controls both.

One of the leading cases relied upon by the *City of Safety Harbor* court was *Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923). *Trenton* held that a city could not maintain a claim that state actions violated the city's rights under the contract clause of the United States Constitution. *Trenton* is but one of a substantial number of Supreme Court cases declaring the same rule.[11] *See, e.g., Coleman v. Miller,* 307 U.S. 433, 441, 59 S.Ct. 972, 976, 83 L.Ed. 1385 (1939) ("Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Four-

---

9. In pertinent part, 42 U.S.C. § 1983 reads:

    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

10. In the cited case, the City of Safety Harbor in Florida brought a section 1983 action against four Florida legislators and two private individuals for conspiring to secure the passage of legislation that operated to impair the obligations of a "Service Area Agreement" Safety Harbor had with two other cities.

11. The *Trenton* line of cases has been thoroughly analyzed by Judge Goldberg in *Rogers v. Brockette,* 588 F.2d 1057 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979). He concludes that the opinions in those cases were not necessarily using the term "standing" to refer to a preliminary or threshold requirement for a municipality to bring a suit; rather, that "[i]n speaking of 'standing,' cases in the ... *Trenton* line meant only that, on the merits, the municipality had no rights under the particular constitutional provisions it invoked." *Id.* at 1070. Be that as it may, Judge Goldberg recognizes that *Trenton* and its many followers "adhere to the substantive principle that the Constitution does not interfere with a state's internal political organization." *Id.*

teenth Amendment of the Constitution in opposition to the will of their creator"); *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privilege or immunities under the federal constitution which it may invoke in opposition to the will of its creator").[12] That line of authority [13] disposes of the section 1983 claim that through the State's accounting malpractice the City of South Portland was deprived of property, whatever its source, in violation of the fourteenth amendment. *See also Appling County v. Municipal Electric Authority of Georgia*, 621 F.2d 1301 (5th Cir.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980).

■ In its section 1983 count, the City of South Portland also claims that the State's accounting malpractice deprived it of property rights secured to it by the Federal Water Pollution Control Act; and it has been suggested that State interference with direct, congressionally authorized dealings between the federal government and a municipality may be actionable. *See Rogers v. Brockette*, 588 F.2d 1057, 1070 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979) (Supremacy

Clause may empower Congress to give municipalities statutory rights protected against State interference). We need not decide, however, whether the City could be given federal statutory rights that are accorded protection against state action; in any event, the State's accounting malpractice did not deprive the City of South Portland of its statutory right to receive the $289,300 reimbursement grant. The City was of course entitled to that $289,300 payment under federal law, but the defendants sued here by the City never interfered with its receiving that payment. On the contrary, the City did receive it and, through its duly authorized officer, invested the proceeds of the $289,300 check in the City's own name for a year or more—until after the Department of Audit's completion of its postaudit examination of the City's accounts for 1975. Only thereafter, through embezzlement committed by its own finance director, was the City deprived of its funds invested at the Presque Isle bank. The embezzled funds belonged to the City and, for the purpose of analyzing the State's involvement in their loss, were indistinguishable from the City's funds coming from taxes or any other source. Even if, as the City asserts, a professional-

**12.** The Supreme Court's decision in *Monnell v. Department of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), does not detract from the validity of the *City of Safety Harbor* holding. It does not logically follow from *Monnell's* holding that a municipality is also a "person" amenable to suit in a section 1983 action that a municipality is also a "person" entitled to bring such a suit. Municipalities are part of the very state governmental structure from which Congress, in enacting the precursor of section 1983, the Civil Rights Act of 1871, sought to protect individuals from abuse of their constitutional rights. The *Monnell* Court recognized that it would be a distortion of congressional intent not to hold municipalities subject to suit under section 1983. A converse holding is mandated by neither legislative history nor common sense. The Civil Rights Act of 1871 was originally entitled "An Act to Enforce the Provisions of the Fourteenth Amendment." As *Coleman v. Miller* and *Williams v. Mayor of Baltimore* demonstrate, it is well settled that a municipal corporation has no right to claim that

a state action has deprived it of rights under the fourteenth amendment. In the absence of a clearly expressed intent, we do not believe Congress in enacting the forerunner of section 1983 meant to create a new right in favor of a municipality.

**13.** We reject the City of South Portland's contention that the Supreme Court's decision in *Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), has *sub silentio* overruled the *Trenton* line of authority. Among the plaintiffs who brought the successful constitutional challenge in the *Seattle* case, there were a substantial number of individuals, including minority students later found to be adversely affected by the state initiative measure under attack. *Seattle School District No. 1 v. State*, 473 F.Supp. 996, 999–1000, 1011 (W.D.Wash.1979), *aff'd in part, rev'd in part*, 633 F.2d 1338 (9th Cir.1980), *aff'd*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). In *Seattle*, the Supreme Court did not consider, and had no reason to consider, *Trenton* and its progeny.

ly competent audit would have disclosed the existence of the City's investment at the Presque Isle bank and thereby have deterred or prevented Mr. Turner from converting the City's funds to his own use, the City does not plead any deprivation of a right under the Federal Water Pollution Act.

The State's arrangement for annual postaudits of the accounts of its municipalities, mandated in 30 M.R.S.A. § 5253, is an internal, prudential structure created to promote financially honest governmental operations. The City of South Portland, being merely an arm of the State, has no basis in the United States Constitution for suing the State and its auditors if that prudential arrangement breaks down. Nor do the factual allegations of its complaint show that it suffered any deprivation of rights secured to it by the cited federal act.

The entry is:

Judgment affirmed.

All concurring.