INTERNATIONAL PAPER COMPANY

v.

TOWN OF JAY, et al.

Supreme Judicial Court of Maine.

Argued June 22, 1995.
Decided Oct. 6, 1995.

James T. Kilbreth (orally), S. Carter Friend, Verrill & Dana, Portland, for Plaintiff.

Christopher J. Hall, Augusta, Todd S. Brilliant, Stephen S. Ostrach, New England Legal Foundation, Boston, MA, for Amici Curiae.

Gerald F. Petruccelli (orally), Linda C. Russell, Petruccelli & Martin, Portland, for Town of Jay.

Andrew Ketterer, Attorney General, Jon H. Edwards (orally), Sarah Roberts Walton, Assistant Attorneys General, Natural Resources Division, Augusta, for Defendants.

Before WATHEN, C.J. and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN and LIPEZ, JJ.

LIPEZ, Justice.

The Town of Jay appeals from the judgment entered in the Superior Court (Franklin County, *Alexander, J.*) vacating, in part, the decision of the Jay Planning Board imposing penalties on International Paper Company (IP) for violating town air emissions standards. IP cross-appeals from the judgment of the Superior Court affirming the balance of the planning board's decision and

dismissing or granting a summary judgment on independent claims filed with the 80B appeal. We affirm the judgment.

On May 21, 1988, Jay enacted the Jay Environmental Control and Improvement Ordinance. *See* Jay, Me., Environmental Control and Improvement Ordinance (Mar. 16, 1992). The ordinance provides a comprehensive plan for protecting and enhancing public health and the environment in the town, and, relevant to this action, prohibits emission of air pollutants without a permit issued by the Jay Planning Board. IP owns and operates a paper mill in Jay that emits air contaminants.

The planning board issued IP an air emissions permit on September 24, 1991 which became final after reconsideration on January 28, 1992. The permit established certain record keeping and reporting requirements and expressly defined acceptable emissions levels both in terms of grains per dry standard cubic foot (gr/dscf) and pounds per hour of particulate leaving the kiln (lb/hr). These limits placed on IP more burdensome emissions requirements than those imposed by the permit issued by the State Department of Environmental Protection.

During four days[1] between November 1991 and June 1992, IP conducted stack testing to establish compliance with town and state emissions levels. On each occasion, IP exceeded either or both of the acceptable town limitations. IP failed to report these excesses to the town code enforcement officer (CEO) within the time specified by its permit.

On June 15, 1992, the State issued to IP a notice of violation (NOV) for two violations of the state permit. Although IP orally notified the CEO of the state NOV, IP did not furnish a written copy of the NOV to the planning board. The action filed by the State against IP for these violations has been stayed pending the outcome of this appeal from the town enforcement action.

On April 12, 1993, the Town issued its own NOV to IP for its failure to comply with the town permit during each of the stack tests.[2] At the conclusion of a hearing before the planning board, the board concluded that it could infer violations of the emissions limits for every day of stack operation above a certain lime mud feed rate.[3] On this basis, the board found that IP had violated the emissions levels on 113 non-stack test days plus the four days on which stack tests indicated excessive emissions. The board also found that IP failed to provide written notice of the state NOV to the CEO, failed to report the stack test results in three quarterly reports, and violated the general source standard. As a result, the board imposed penalties totalling $394,000.[4]

IP challenged the board's decision in a five count complaint. Count I was an 80B appeal.[5] IP further asserted in four indepen-

---

[1] The record is inconsistent on the number of days on which stack tests were completed.

The planning board and the Superior Court refer to four stack test violations, yet the Notice of Violation (NOV) describes only three dates. (*See* footnote 2). The Superior Court's conclusion that four stack tests were conducted has not been challenged by IP on appeal. We accept that conclusion as accurate.

[2] The NOV referenced the following three stack test failures:

The emission testing of lime kiln A on November 19, 1991, February 18, 1992 and June 25, 1992 yielded results that were in excess of the DEP License and the Jay Permit limits, and in violation of applicable standards in state laws and regulations, Federal laws and regulations and the Ordinance.

Jay, Me. Environmental Control and Improvement Ordinance, Notice of Violation (Apr. 12, 1993) (citations omitted).

[3] The lime mud feed rate is an operating parameter which measures the amount of air used and its particulate content as a result of chemical reactions to the lime mud used during kiln operations.

[4] The breakdown of the penalties was as follows: 53 days exceeding the gr/dscf @ $10,000/day, with all but $2,000/day suspended; 64 days exceeding the lb/hr limit @ $4,000/day; $5,000 for violation of the general source standard; $17,000 for the three quarterly reporting violations; and $10,000 for failure to report the state NOV in writing.

[5] M.R.Civ.P. 80B provides:

When review by the Superior Court, whether by appeal or otherwise, of any action or failure or refusal to act by a governmental agency, including any department, board, commission, or officer, is provided by statute or is otherwise

dent claims, *see* M.R.Civ.P. 80B(i), that (a) the ordinance was preempted by state law (count II); (b) the ordinance as applied to IP violated guarantees of due process (count III); (c) the board made its decision in violation of the Freedom of Access law, 1 M.R.S.A. §§ 401–410 (1989 & Supp.1994) (count IV); and (d) enforcement of the ordinance violated IP's right to equal protection of the laws (count V). The State intervened as an interested party.

In response to a motion filed by the Town seeking dismissal of or a summary judgment on the independent claims, the trial court dismissed count II (preemption) and granted a summary judgment in favor of Jay on counts III and V (due process and equal protection). Although the court denied the town's motion to dismiss count IV, it subsequently ruled, following a hearing on the merits, that the Town was entitled to a judgment on the freedom of access claim.

On the 80B appeal, the court ruled that the board erred in finding that IP violated the town permit levels on the non-stack test days and vacated the penalties for those 113 days. The court further ruled that the ordinance did not require IP to report the state NOV in writing, and vacated the board's assessment of $10,000 for that alleged failure. The court upheld the penalties for the three quarterly reporting violations and for violation of the general source standard. It remanded the case to the board for reconsideration of the appropriate level of penalties assessed for the four stack test violations. Both IP and Jay have appealed from those portions of the court's decision unfavorable to their positions.[6]

### Preemption

■ IP argues that the Jay ordinance is preempted by state law because enforcement would frustrate the purpose of the state statute on air quality control. IP's challenge to the board's authority to regulate air quality contests the board's jurisdiction to impose penalties at all. *See City of South Portland v. State*, 476 A.2d 690, 696 (Me.1984) (municipality only has such powers as the legislature has either expressly or implicitly conferred upon it); *Clark v. State Employees Appeals Bd.*, 363 A.2d 735, 736 (Me.1976) (authority of administrative body limited to the framework established for them by the Legislature); RESTATEMENT (SECOND) OF JUDGMENTS § 11 (1982) ("A judgment may properly be rendered against a party only if the court has authority to adjudicate the type of controversy involved in the action."). Subject matter jurisdiction is always subject to our scrutiny. *Dowey v. Sanford Housing Auth.*, 516 A.2d 957, 959 (Me.1986).

■ Pursuant to the broad home rule authority set forth in 30–A M.R.S.A. § 3001 (Pamph.1994), the Legislature has conveyed a plenary grant of the state's police power to municipalities, subject only to express or implied limitations supplied by the Legislature. *School Comm. of Town of York v. Town of York*, 626 A.2d 935, 938 (Me.1993). The home rule statute provides in pertinent part:

> Any municipality, by adoption, amendment or repeal of ordinances or bylaws, may exercise any power or function which the Legislature has power to confer upon it, which is not denied either expressly or by clear implication, and exercise any power or function granted to the municipality by the Constitution of Maine, general law or charter. . . . The Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law.

available by law, proceedings for such review shall ... be governed by these Rules of Civil Procedure as modified by this rule. M.R.Civ.P. 80B. *See Lyons v. Board of Directors of School Admin. Dist. Number 43*, 503 A.2d 233, 235 (Me.1986) (Rule 80B is not an independent grant of jurisdiction, but only a procedural mechanism for review of governmental action if jurisdiction to review it otherwise exists). The Jay ordinance grants any person aggrieved by the board's decision in an enforcement proceeding the authority to seek judicial review of the board action. Jay, Me., Environmental Control and Improvement Ordinance § 4–108 (Mar. 16, 1992).

6. IP does not challenge the court's ruling on counts III (due process) and IV (freedom of access law).

30–A M.R.S.A. § 3001. Municipal legislation will be invalidated, therefore, only when the Legislature has expressly prohibited local regulation, or when the Legislature has intended to occupy the field and the municipal legislation would frustrate the purpose of a state law. *School Committee of Town of York,* 626 A.2d at 939. *See Tisei v. Town of Ogunquit,* 491 A.2d 564, 570 (Me.1985); *James v. Town of West Bath,* 437 A.2d 863, 865 (Me.1981). *See generally* Comment, *Home Rule and The Pre-emption Doctrine: The Relationship Between State and Local Government in Maine,* 37 Me.L.Rev. 313 (1985).

██ Here, the relevant state statute does not expressly deny municipalities the authority to enact air quality legislation. Rather, the language of the statute plainly authorizes municipalities to adopt ordinances to control air pollution:

> Nothing in this chapter shall be construed as a preemption of the field of air pollution study and control on the part of the State. Municipalities may study air pollution and adopt and enforce air pollution control and abatement ordinances, to the extent that these ordinances are not less stringent than this chapter or than any standard, order or other action promulgated pursuant to this chapter....

38 M.R.S.A. § 597 (1989). The Legislature could not state more clearly its intention not to occupy the field of air pollution control.

The Jay ordinance does not frustrate the purpose of the state statute. The state statute on air protection and improvement, 38 M.R.S.A. §§ 581–608–A (1989 & Supp.1994), provides as its purpose:

> The Legislature by this chapter intends to exercise the police power of the State in a coordinated state-wide program to control present and future sources of emission of air contaminants to the end that air pollution activities of every type shall be regulated in a manner that reasonably insures the continued health, safety and general welfare of all of the citizens of the State; protects property values and protects plant and animal life.

38 M.R.S.A. § 581 (1989). To the extent that the Jay ordinance compels a more stringent level of emissions compliance than state standards, it shares and advances the same purposes and concerns expressed by the state law. *See Central Maine Power Co. v. Town of Lebanon,* 571 A.2d 1189, 1194–95 (Me. 1990) (when local law requires a more stringent standard, both state and local law advance the same purpose, and thus, purpose of state law is not frustrated by enforcement of local law). Jay is free to enact and enforce air quality regulation without offending state law provided that the terms of its regulation are no less stringent than state law. *See* 38 M.R.S.A. § 597.

Notwithstanding the authority granted to municipalities by section 597 to regulate the air quality within its boundaries, IP contends that the statutory language does not permit Jay to impose penalties for violations of its ordinance. We disagree.

██ The meaning of statutory language is a question for the court. *Bakala v. Town of Stonington,* 647 A.2d 85, 87 (Me.1994). We must give the words in the statute their plain and ordinary meaning and must avoid construing statutory language to create an absurd, inconsistent, unreasonable or illogical result. *Bushey v. Town of China,* 645 A.2d 615, 617–18 (Me.1994). *See also Larson v. New England Tel. & Tel. Co.,* 141 Me. 326, 337, 44 A.2d 1, 6 (Me.1945) ("The Legislature is presumed to intend that its language be given its ordinary meaning.").

██ Section 597 specifically authorizes municipalities "to study air pollution and adopt and *enforce* air pollution control and abatement ordinances...." 38 M.R.S.A. § 597 (emphasis added). The ordinary meaning of the word *enforce* is to 'compel obedience to' or 'to cause to be executed.' *Larson,* 141 Me. at 337, 44 A.2d at 6–7. *See also* THE AMERICAN HERITAGE DICTIONARY 454 (2d ed. 1982). We must assume that this ordinary meaning was intended by the Legislature. IP's attempt to obscure that ordinary meaning with references to the case law of other states or other Maine statutes is unpersuasive.

██ We have previously stated that penalties imposed for the failure of a party to

adhere to state emissions standards serve to coerce compliance with those standards. *Department of Envtl. Protection v. Emerson,* 616 A.2d 1268, 1270 (Me.1992). The statute discussed in *Emerson* explicitly provided certain factors that should affect the amount of the civil penalty imposed. *See* 38 M.R.S.A. § 349 (1989 & Supp.1994). The Jay ordinance incorporates those statutory factors and adopts additional factors for setting the penalty amount.[7] We recognized in *Emerson* that the civil penalty imposed did not lose its primary coercive purpose because it might secondarily deter others from violating the law. We conclude, therefore, that the Jay penalty provisions appropriately serve to coerce compliance with the town's ordinance. Such coercion is essential to enforcement. The town's action to enforce its ordinance by imposing penalties for violation of the ordinance is sanctioned by the Legislature.[8]

### The Violations

■ IP argues that the planning board relied on the lime mud feed rate, an unsanctioned testing method, to circumstantially prove emissions violations, and that pursuant to the town's ordinance, the only acceptable method of testing to show violations is stack testing. The Town asserts that the ordinance does not limit "what proof may be offered to prove the violation."

The town's argument runs afoul of the same plain meaning principle that supports the enforceability of its ordinance. The Jay ordinance provides in part:

7. The ordinance provides:
   In setting penalties the following shall be considered:
   1. Prior violations by the same person;
   2. The degree of environmental damage that cannot be abated or corrected;
   3. The extent to which the violation continued;
   4. Benefits derived by the person as a result of the violation;
   5. Importance of setting a civil penalty substantial enough to deter future violation;
   6. Whether penalties have been imposed by another governmental agency for the same incident(s).
   Jay, Me., Environmental Control and Improvement Ordinance § 4–111 (Mar. 16, 1992). *Compare* 38 M.R.S.A. § 349 (same factors with the exception of (4) and (6)).

Compliance with air emission standards of Part 5 shall be determined by the methods and procedures codified in 40 CFR part 60, as amended, or a generally accepted measurement method approved by the Board, including without limitation the use of continuous emissions monitors. In addition, the Board may require periodic emission tests on key equipment at major sources.

Jay, Me., Environmental Control and Improvement Ordinance § 13–508 (Mar. 16, 1992). The board has not approved any other testing method of measuring compliance with the emissions standards, including reliance on the high correlation between the lime mud feed rate and the violation of permissible emissions levels. Therefore, approved methods are limited to the methods prescribed by 40 C.F.R. part 60, that provides compliance may be determined only by performance testing, such as stack testing. 40 C.F.R. §§ 60.08 & 60.11 (1994). If these methods are too restrictive in practice, the Town can amend its ordinance or the board can approve a generally accepted measurement method which, having been duly adopted, can fairly be applied in an enforcement proceeding. The Town cannot respond to the deficiencies of its ordinance by rewriting it in the midst of an enforcement proceeding.

The board's reliance on the mode of proof offered by the Town to show violations on non-stack test days was a legal error. The court correctly vacated those penalties.

8. IP has asked us to decide the preemption issue on the basis that principles of double jeopardy preclude a court from imposing penalties in a subsequent state enforcement action, and hence this local enforcement action will frustrate the purpose of state law. This double jeopardy claim requires too much speculation about the penalties to be imposed in the state action to permit its resolution in this case. *See State v. Savard,* 659 A.2d 1265, 1267 (Me.1995). We reject on the same basis of premature speculation IP's argument that application of the principles of res judicata and collateral estoppel would frustrate the purpose of state law, and hence require a ruling of preemption. *See Spickler v. Dube,* 644 A.2d 465, 467 (Me.1994) (res judicata); *Mutual Fire Ins. Co. v. Richardson,* 640 A.2d 205, 208 (Me.1994) (collateral estoppel).

*Other Penalties and Claims*

 The only penalties remaining for our review·are the quarterly reporting violations and the violation of the general source standard.[9] The board did not abuse its discretion in setting the penalty amounts for those violations. *United States v. B & W Inv. Properties*, 38 F.3d 362, 367–68 (7th Cir.1994) (Clean Air Act), *cert. denied, B &˙ W Inv. Properties v. United States*, —— U.S. ——, 115 S.Ct. 1998, 131 L.Ed.2d 1000 (1995); *see United States v. Midwest Suspension and Brake*, 824 F.Supp. 713, 735–38 (E.D.Mich. 1993) (Clean Air Act).

Finally, the court did not err in granting a summary judgment to the town on IP's equal protection claim (count V).

The entry is:

Judgment affirmed.

---

**9.** Our review of the arguments on appeal discloses that the Town has not challenged that portion of the judgment vacating the penalty imposed for IP's failure to report the state NOV in writing. Additionally, the penalties imposed by the board for the four stack test days have been remanded to the board for reconsideration and are not before us for review.