Nicholas R. AMATO, County Executive of the County of Essex and the County of Essex, a political subdivision of the State of New Jersey, Plaintiff,

v.

Robert N. WILENTZ, individually and in his official capacity as Administrative Head of the New Jersey Judiciary System, Defendant.

No. 90–1951.

United States District Court,
D. New Jersey.

Dec. 18, 1990.

544

Francis P. McQuade, Acting Essex County Counsel, Newark, N.J., Edward F. Lamb, Edward A. Hartnett, Robinson, St. John & Wayne, Newark, N.J., on behalf of the American Civil Liberties Union of New Jersey, for plaintiff.

Douglas S. Eakeley, First Asst. Atty. Gen., Benjamin Clark, Deputy Atty. Gen., Robert J. Del Tufo, Atty. Gen. of N.J., Trenton, N.J., for defendant.

## OPINION AND ORDER

POLITAN, District Judge.

This is a case to determine the constitutionality of certain acts taken by defendant Robert Wilentz, Chief Justice of The Supreme Court of New Jersey, prohibiting Warner Brothers ("Warner") from filming scenes for a commercial motion picture in the Old Essex County Courthouse ("Courthouse"). The plaintiffs are Nicholas Amato, Essex County Executive, and the County of Essex. They instituted this action on May 16, 1990, seeking declaratory and injunctive relief, as well as compensatory damages, on the grounds that the Chief Justice acted under color of state law, in violation of the Civil Rights Act of 1868, 42 U.S.C. § 1983, to deprive Warner of rights secured by the First Amendment of the United States Constitution. Presently before the Court are cross-motions for summary judgment. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

## FACTS

The Old Essex County Courthouse has been used as a setting for a variety of artistic activities, including commercial filmmaking. Specifically, the Courthouse was used to film "She–Devil" in June 1989, "Rage of Angels" in September 1982, "Rage of Angels II", in April 1986, "Presumed Innocent" in August 1989, "Jacobs Ladder" in September 1989, "Invasion of Privacy" in February 1982, "The Firm" in March 1982. The CBS television news program "48 Hours" was filmed in September 1989, and in April 1989 the rap singer L.L. Cool. J. used the Courthouse to produce a music video. The first four productions were all filmed during the day while the court was in session.

Essex County charges a set fee for the use of Courthouse facilities including the exterior. The County received a fee for each of the productions listed above. According to Amato, during his tenure, the County has never denied access to the Essex County Courts for "artistic produc-

tions." The County does not have a fixed policy or procedure governing content review of requests to use County facilities for film productions.

The acts giving rise to this litigation first occurred in April 1990. During that period Warner transmitted a request to the Chief Justice to shoot a "walking" scene in the Courthouse hallway for use in a movie based on the popular Tom Wolfe novel "Bonfire of the Vanities". The Chief Justice reviewed the content of the scene and determined that it was "innocuous." He therefore approved Warner's request.

In late April, Warner transmitted a second request to the Chief Justice. This request asked to use either the Ocean or Somerset County Courthouse to film the climactic scene of the novel. In the scene, a court room filled with predominantly black spectators, erupts into a violent riot after the trial judge dismisses an indictment filed against the novel's protagonist, Sherman McCoy.[1] The Chief Justice indicates that he denied the request because of its content. He states:

> In essence, I believed and believe that the scene, because of its content, could cause justifiable offense to any black person, and I also believed and believe that, upon learning that the scene had been shot in a New Jersey courthouse—*with the express permission of the Chief Justice* (emphasis in original)—any black person would have justifiable cause to question the sensitivity of the New Jersey judiciary to the interests and concerns of blacks. If called upon to explain why I had approved the use of the state judiciary's facilities and resources—the use of a courtroom—for a private, commercial film showing blacks acting in violent and flagrant disrespect for the rule of law—indeed, for the specific purpose of filming a scene that depicted blacks in the worst possible stereotype—I could think of no adequate response.

Freeman.

---

1. In the novel, the trial Judge is a Jewish man. In the film, he is black, played by actor Morgan

Despite this setback, Warner continued to express interest in New Jersey's historic courthouses. On or about May 8, the Chief Justice learned that Warner sought permission to film the troublesome scene in the Essex County Courthouse. The defendant advised Essex County Assignment Judge Humphreys that such a request should be rejected.[2] On or about the same day, the County Executive reached an agreement for use of the Courthouse with the Production Manager and Producer of the film. In a letter memorializing that agreement, the Production Manager, Peter Runfolo wrote:

As per our conversation this morning, Warner Brothers would like to film sequences from the major motion picture entitled "Bonfire of the Vanities" in Room 226 of the Essex County Courthouse. The filming would take place during non-court hours for approximately 5–7 days.

In consideration for this, Warner Brothers has agreed to donate $250,000 to the County of Essex and Warner Brothers further respects your request to donate said money directly to the restoration fund of the Essex County Courthouse.

Since time is of the essence we await your response.

Widespread publicity followed the Chief Justice's decision and he therefore issued a formal press statement outlining his reasons and motivations. This statement provides in its entirety:

Permission to utilize a New Jersey courtroom to film a particular scene for the production, "Bonfire of the Vanities," has been denied because its use could serve to seriously undermine the confidence of black citizens in our court system.

The scene, involving black persons acting in a riotous, lawless and life-threatening manner, could very easily raise questions concerning why a New Jersey courtroom would be used for such a purpose.

Encouraging the confidence of the movie industry in our court system is not as important as risking the confidence of those whose confidence in it is, for many reasons, already vulnerable.

Should permission be granted, it would not be difficult to reach the conclusion that those responsible for justice in New Jersey do not care how blacks are portrayed or that they are unaware or unconcerned with such a portrayal.

It is not our desire to pass judgment on the artistic merits of the film; rather, it is our feeling that the assumed advantages of allowing a courtroom to be used for this particular scene are outweighed by the risk of identifying New Jersey's court system with a portrayal which will erode the confidence of black citizens in our system of justice.

We have no desire to impede or advance this film. That is none of our business. But confidence in our justice system, confidence in our awareness of the sensitivities and concerns of blacks about our justice system, is very much our business.

Nevertheless, the dogged Warner continued to lobby for use of the historic Courthouse. On May 11 they once again transmitted a request to the Chief Justice and the County. This scene, a "continuation" of the riot scene previously rejected, was to show Sherman McCoy and the Judge fleeing from the "angry mob." The Chief Justice states that "Based upon my review of the proposed scene, I had only one objection to its being filmed in a New Jersey courtroom ... at the tail end of the "escape" scene, the judge (I believe) was to pull down a fence or grate to hold back the

2. Theodore J. Fetter, Deputy Director of the Administrative Office of the Courts ("AOC"), states in a supplemental affidavit that on April 30 when the Chief Justice denied Warner's request to use the Ocean and Somerset County facilities "it was clearly understood by all parties that the Chief Justice's decision was a categorical one, and not a courthouse-specific one." There are various problems with this assertion, most importantly the fact that the Chief Justice's affidavit directly contradicts it. The Chief Justice states that "I denied Warner Bros.' request to film the scene in either the Ocean or Somerset County courthouse." He does not in any way indicate that Warner Bros. understood his denial to be state-wide. Indeed, Warner's conduct is inconsistent with a clear understanding that the Chief Justice's decision was state-wide.

threatening mob as it attempted to pursue the judge and the defendant down a staircase; ... I, therefore, advised Warner Bros. that it could film the "escape" scene in the Old Essex County Courthouse as long as it omitted—*not from the movie itself, but from the scene being filmed in the Courthouse* (emphasis in original)—the sequence in which the grate or fence is pulled down to restrain the mob." It could film the scene so long as it did not show "a mob of blacks rioting in the Courthouse...."

Acting with decided speed, the County filed this law suit on May 16. The next day, the Chief Justice appointed a special committee chaired by Judge Ralph Martin ("Martin Committee") to study the issue and recommend a policy for the judiciary to follow concerning the use of state courtrooms for filming.[3] In conjunction with the appointment of this Committee, the Chief Justice suspended all commercial filmmaking activity in New Jersey.

On July 5, 1990 the Committee issued a comprehensive report which concluded that the judiciary should not be involved in content review of film applications. The Committee also noted:

> Goals of preserving public confidence in judicial impartiality and integrity can be achieved by appropriate disclaimers both in the review application procedure and within the final product itself. By these disclaimers, public perception of inappropriate subject matter can be focused on the granting authority rather than the Judiciary.

The Chief Justice substantially rejected the recommendations of the Martin Committee, including its conclusion that ultimate decisions concerning off-hour filming should be left to the discretion of county officials. Rather, the Chief Justice concluded that a state-wide panel operating under "uniform" standards should be es-tablished to review all commercial film requests. He, therefore, appointed a new improved permitting committee of five and also detailed certain guidelines governing its operations. Absent such restrictions the Chief Justice indicated that "the scenes filmed and the films themselves could clearly pose a substantial risk to the judiciary." Films presenting such an imminent risk to the judiciary include those addressing "highly controversial current issues, upon which the public may be divided into severely antagonistic groups", "Partisan political films" and those in which a "scene is so offensive to a particular group—for instance a devastating stereotype of a racial, ethnic, or religious group—". The Chief Justice also stated that he intends to review the operation of the committee after one year to assure that it is operating smoothly.

## LEGAL ARGUMENT

The plaintiffs' argument is straightforward. They argue that under the First Amendment public officials cannot regulate the use of public facilities for expressive activity on the basis of viewpoint. It is thus suggested that it is irrelevant whether the Old Essex County Courthouse is a public forum or a non public forum because Wilentz' action constituted impermissible "viewpoint" discrimination. *See Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 811, 105 S.Ct. 3439, 3453–54, 87 L.Ed.2d 567 (1985) ("The existence of reasonable grounds for limiting access to a nonpublic forum ... will not save a regulation that is in reality a facade for viewpoint based discrimination."). Plaintiffs further posit that the alleged First Amendment violation at issue is even more egregious because the Courthouse constitutes a designated public forum. In the alternative, the plaintiffs assert that even if Wilentz' action was content based

---

**3.** The members of the Committee included: Superior Court Judge Leonard N. Arnold; William G. Bischoff, Retired Appellate Division Judge; Thomas J. Cafferty, Counsel to New Jersey Press Association; Robert R. Comstock, Professor of Journalism, Rutgers University; Joseph Friedman, New Jersey Motion Picture Commission; Robert C. Janiszewski, Hudson County Executive; Judge Virginia Long, Appellate Division; Robert G. Ottenhof, Executive Director of the New Jersey Public Broadcasting Authority; Ronald Riccio, Dean Seton Hall Law School; Michael E. Uslan, President Batfilm Productions; Justin P. Walder, Trial Attorney.

rather than viewpoint based, it does not satisfy strict scrutiny analysis. Finally, plaintiffs argue that neither qualified nor judicial immunity protect Wilentz from damage judgments for acts taken in his administrative capacity.

Wilentz raises a variety of procedural and substantive arguments in defense. First, he contends that the County lacks standing because as a political subdivision of the state it has no right to challenge state action on the basis of an alleged Federal Constitutional violation. *See City of Safety Harbor v. Birchfield,* 529 F.2d 1251, 1254 (5th Cir.1976). He also asserts that plaintiffs' claim for declaratory and injunctive relief is moot because of the appointment of the permitting committee. Substantively, relying on *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Chief Justice asserts that "the government does not infringe on free speech when it chooses not to lend or devote its own resources to private expressive activity." In such cases, he urges that the Court must distinguish between abridgement of speech and "non sponsorship". Conceptually, he thus argues that public forum analysis does not apply at all to this case. Under such analysis, however, the Chief Justice asserts that even if the Essex County Courthouse is a designated public forum his action was constitutionally valid, notwithstanding the fact that it was content based, because it served a compelling state interest. Needless to say, the Chief Justice does not concede that the Courthouse is a designated public forum. On the issue of damages, Wilentz argues that he is protected by the Eleventh Amendment and principles of judicial and qualified good faith immunity.[4]

4. It is also important to note the procedural posture of the case. The Complaint was filed on May 16, 1990. Plaintiffs' summary judgment motion was filed on October 25, 1990. The defendant, therefore, had almost five months to conduct discovery. He simply chose not to exercise his right to conduct such discovery. The standards governing summary judgment under Rule 56 have been exhaustively detailed in the trilogy of Supreme Court cases, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Summary judgment may thus be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to the party's case, for which that party will bear the burden of proof at trial.

In resisting a summary judgment it is insufficient to merely allege that factual issues are in dispute. Rather, the non-moving party must demonstrate with legally cognizable evidence that the factual issues are material. *Jersey Central Power & Light Co. v. Township of Lacey,* 772 F.2d 1103, 1109 (3rd Cir.1985), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). An issue of fact cannot be created in a brief but again, must be demonstrated with legal evidence. *Id.* at 1109-10. Here, the defendant *did not* demonstrate with legally cognizable evidence that factual issues prevented judgment as a matter of law. Indeed, the defendant wrote that "in general, [he] agrees with plaintiff that no material issues of disputed fact prevent the court from disposing of the case at this juncture, but emphatically disagrees that, under plaintiffs' theory, no such issues exist." Specifically, the defendant posited in his *brief* that issues of fact existed concerning the judiciary's intention to designate the Courthouse as a public forum. As stated, this assertion was not supported by legally admissible evidence.

Moreover, at oral argument counsel suggested that a fact issue existed concerning knowledge of Warner's "alleged" $250,000. donation to Essex. The court allowed the defendant, after the close of discovery and after the submission of papers in opposition to the summary judgment motion, the opportunity to submit a supplemental affidavit. The court also allowed the defendant the opportunity to depose the plaintiff on the issue of the $250,000. payment. This permission was conditioned on making himself available for deposition *solely* on the question of the fee, an issue that he himself raised. The suggestion in certain letters to the court that it would allow the deposition of Amato only if Wilentz was available for a general free ranging deposition is unfounded, unsupported by the record and offensive. Without addressing the question of whether the defendant may have waived any privilege by submitting an affidavit and press release the court notes that the transcript states: "The issue which was raised last week by Mr. Eakeley, on behalf of the State, was the question of whether or not the Chief Justice was aware of the fact that there was a

## STANDING

■ The first procedural issue before the court concerns standing. There are two distinct lines of inquiry the court must undertake in this area. The first concerns whether the plaintiffs have satisfied the "case and controversy" requirement of Article III of the United States Constitution. *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). This requirement is met where the plaintiff *himself* has suffered "some threatened or actual injury resulting from the putatively illegal action...." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974) (*citing, Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148–49, 35 L.Ed.2d 536 (1973)); *see, e.g., Data Processing Service v. Camp,* 397 U.S. 150, 151–154, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). The constitutional prong therefore requires, at the very least, an actual injury redressable by the court. *Director, Office of Workers' Comp. Programs v. Perini North River Assocs.,* 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983).

The Supreme Court has also outlined various "prudential" limitations on a federal court's jurisdiction. Generally, the plaintiff can only assert "his or her own legal interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth, supra,* 422 U.S. at 499, 95 S.Ct. at 2205 (citing, *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943); *United States v. Raines,* 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)). Moreover, the harm asserted cannot be a generalized grievance shared by the majority of the populace. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. These limitations assure that a court does not issue "unnecessary pronouncement[s]" on constitutional issues, *Secretary of State of Md. v. J.H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1983), and that the issues before the court "will be concrete and sharply presented." *Id.* (*citing,*

*Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Nevertheless, in certain cases, the Court has allowed litigants standing to assert the rights of others. In such cases the inquiry focuses on whether "the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Secretary of State,* 467 U.S. at 956, 104 S.Ct. at 2846 (*citing, Craig v. Boren,* 429 U.S. 190, 193–194, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976)). Finally, in the context of the First Amendment, the Court also considers whether the directly affected party, although able to challenge the statute or action, "may refrain from engaging further in the protected activity" rather than risking "punishment for his conduct...." *Id.* The essence of this consideration is the "danger of chilling free speech". *Id.* "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973); *See also, Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834–35, 63 L.Ed.2d 73 (1980) ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the Court").

Analysis of these varied factors establishes that the plaintiffs before the court have standing to challenge the action of this defendant. The constitutional requirement is patently satisfied in that this plaintiff has suffered concrete injury to itself directly traceable to the acts of the defen-

$250,000. offer to use the Courthouse.... I am satisfied that if the State wants to take deposition of Mr. Amato *on that issue* and inspect documents simultaneously, the deposition of the

Chief Justice will be *taken on the very same issue* on the very same day at the very same time." *Res Ipsa Loquitur.*

dant.[5] That is the loss of revenue. *See Singleton,* 428 U.S. at 113, 96 S.Ct. at 2873–74; *Virginia v. American Booksellers Assn.,* 484 U.S. 383, 392, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1987). It is not dispositive that there is some present confusion concerning whether Warner Bros. offered the County $250,000. before or after the Chief Justice initially denied permission to film in the Essex County Courthouse. It is not disputed that the County would have received, at the very least, the usual permit fee from Warner. The fee is in addition to the film producer's obligation to compensate the County for the costs of providing sheriff's officers, county police officers, electricians and maintenance workers. The permit fee, therefore, constitutes income and profit. It's loss is sufficient injury in fact to satisfy Article III.

■ There are also no prudential considerations present that would counsel against finding standing. The facts demonstrate that this plaintiff is uniquely qualified to present these issues with "adversarial zeal." *See Craig v. Boren,* 429 U.S. 190, 193–194, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976). Without questioning the plaintiffs' concerns for free speech, the court notes that the pursuit of revenue or income is perhaps the greatest motivator of any human or government activity. It can cause an ordinarily lethargic government to move with the speed and deliberateness of a private organization. Correspondingly, the loss of revenue, and the distinct possibility of losing revenue in the future, can similarly cause the apathetic to come alive. Here, the County faces just such a prospect and should, therefore, be considered a proper party to prosecute this action with adversarial zeal.[6]

There are other important reasons why the County is a proper party to litigate this matter. The practical reality is that a film company, denied access to a Courthouse, would more than likely simply seek another venue rather than challenge the constitutionality of the subject action. This is true for a variety of reasons, most significantly because of the numerous financial and time constraints circumscribing a film company's activities. The fact is that a film company simply cannot afford to become embroiled in time consuming complex litigation while producing a motion picture. Indeed, in this case, such considerations compelled Warner to immediately seek another venue. The fact that they found one does not impact consideration of whether their banishment from Essex County was, in the first instance, constitutionally justified. Rather, it dramatically illustrates why in the future a film company is likely to refrain from engaging in a protected activity and, therefore, why plaintiffs should be allowed third party standing to challenge the defendant's conduct.

It is also true that a court must always be conscious of the danger of chilling free speech and expression. In this case, such considerations counsel that the court find third party standing. The court rejects the suggestion that the production of a motion picture is an undefined, amorphous preparatory activity entitled to less protection than other forms of speech and expressive activity. The fact is that the final product, the film, cannot be artificially severed from the activity surrounding its creation. The one is the umbilical cord of the other and cannot exist alone. To allow censorship, or the abridgment of one, would inevitably

---

5. The Constitutional aspect of standing requires the court to examine three separate prongs: (1) distinct injury; (2) causation; and (3) that the injury can be redressed by a remedy the Court is prepared to give. These factors are patently satisfied in this case. Analyzed as a traditional tortious interference with contract the County of Essex had a contract with Warner Bros. which was tortiously interfered with by the Chief Justice. In this case, the tort being a violation of the Amendment. There is, therefore, a clear confluence of these three factors.

6. The cases relied upon by Wilentz to demonstrate that the County lacks standing, *see City of Safety Harbor v. Birchfield,* 529 F.2d 1251, 1254 (5th Cir.1976), are fundamentally inapposite because the County is not arguing that its constitutional rights were violated. Rather, plaintiffs assert that Warner's First Amendment rights were violated and that it has third party standing to litigate the issue.

impact the free flow of ideas and information consequent to the release of the other.

The Supreme Court has in fact expressly held "that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1951). The Court explained that while "each method [of speech] tends to present its own peculiar problems" the "basic principles of freedom of speech and the press, like the First Amendment's command, do not vary. Those principles ... make freedom of expression the rule." The court did not find it relevant that a motion picture, like a book or newspaper, is often designed to entertain as well as to inform. *Id.* at 501, 72 S.Ct. at 780. Justice Clark wrote that such considerations simply do not prevent "them from being a form of expression whose liberty is safeguarded by the First Amendment." *Id.* The same considerations are present here and this court finds no reason to make an exception for the distinct creative and expressive activity essential to the production of a film.

The need to consider film and filmmaking as a protected activity is even more essential because of the ever increasing importance of movies to American culture. While the motion picture has always formed a vital part of the fabric of our society and our collective memories as Americans, its importance has consistently increased as the circulation of newspapers and other written materials has consistently declined. Film has in many ways, as never before, replaced the written work as a vehicle for the transmission of ideas, viewpoints and opinions. It is a vital medium that serves to stimulate important political and social debate. In support of this conclusion the court takes judicial notice of the controversy surrounding the release of Martin Scorsese's "Last Temptation of Christ" and Spike Lee's "Do The Right Thing." Both films ignited intense public debate concerning the role of religion and race in American life. As such, the court should carefully examine any activity that threatens to chill or impede the production

of film and the free flow of ideas inherent in its creation and consequent to its showing.

## MOOTNESS

■ The court next addresses the contention that this case is moot. In general, a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *United States Parole Commission v. Geraghty*, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980), *quoting, Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). A case can become moot in a variety of ways. For example, a law may change, *United States v. Alaska S.S. Co.*, 253 U.S. 113, 40 S.Ct. 448, 64 L.Ed. 808 (1920), the wrongful conduct may pass without possibility of repetition, *S.E.C. v. Medical Committee for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), a judgment may no longer affect the rights of a party, *Atherton Mills v. Johnston*, 259 U.S. 13, 42 S.Ct. 422, 66 L.Ed. 814 (1922), or a party may die, *Durham v. United States*, 401 U.S. 481, 91 S.Ct. 858, 28 L.Ed.2d 200 (1971).

The most important exception to the general principles governing mootness is a matter "capable of repetition, yet evading review." *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1981). This doctrine is limited to cases where: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.*, (*citing, Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 187, 99 S.Ct. 983, 991–92, 59 L.Ed.2d 230 (1979); *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). In order to satisfy this exception there must be more than a "theoretical possibility" that the challenged action would reoccur. Rather, there must be a "'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining

party." *Id.*, (*citing, Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). It is also true that the "availability of damages or other monetary relief almost always avoids mootness." *Jersey Cent. Power v. State Of N.J.*, 772 F.2d 35, 41 (3d Cir.1985) (*citing, Ellis v. Brotherhood of Railway Airling & Steamship Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *Powell v. McCormack*, 395 U.S. 486, 496–497, 89 S.Ct. 1944, 1950–1951, 23 L.Ed.2d 491 (1969)).

Under this standard, the present case is not moot. The alleged unconstitutional action at issue in this case will always occur in such a short time span that it can never be fully litigated before the court would be able to redress the specific underlying wrong. As discussed previously, a movie company, compelled by time and financial considerations, is unlikely to litigate the Chief Justice's action before seeking an alternate production venue.

The conduct at issue is also distinctly capable of repetition. Although the Chief Justice vigorously asserts that there is "no reasonable probability that [he] will ever again have occasion to pass on a request to use a state courthouse for filmmaking purposes" there is little in the record to support this position. Indeed, the Chief Justice admits that he will review the performance of the permitting committee at the end of the year. Nevertheless, he suggests "that there is no reason to believe that the new system will prove to be unworkable or even problematic." [7] Again, the record belies this assertion. The facts demonstrate that this defendant has consistently failed to honor the findings and conclusions of committees appointed by himself for the simple reason that he disagrees with the committee's conclusions. The guidelines surrounding the creation of the new permitting committee do not prevent the Chief Justice from acting accord-

ing to this historical pattern in the future. To the contrary, the very nature of the guidelines suggest that, if they are erroneously applied in a manner inconsistent with the Chief Justice's viewpoint concerning the proper content for a film produced in a New Jersey courthouse, he will summarily disband that committee and replace it with a more responsive assembly. Simply stated, there is nothing to prevent the Chief Justice from again substituting his judgment for that of the permitting committee.

Moreover, a defendant's voluntary cessation of a challenged practice "is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1981); *See also, United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The court's power to grant injunctive relief "survives discontinuance of the illegal conduct" if, as stated, "there exists some cognizable danger of recurrent violation. . . ." *W.T. Grant*, 345 U.S. at 633, 73 S.Ct. at 898 (*citing, Hechl Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). Here, such a danger is readily apparent. More importantly, even if it were absent, the case would still not be moot given the fact that plaintiffs' Complaint contains a distinct damage count. As such, the court will address the merits of this controversy.

## FORUM ANALYSIS

The court now turns to the penultimate issue of the case, characterizing what type of forum the Essex County Courthouse is for the purposes of First Amendment analysis.[8] The court recog-

---

7. The guidelines created for this committee are so amorphous that it is hard to comprehend how they cannot prove problematic.

8. There is little question that the relevant forum is the Essex County Courthouse rather the entire state. In defining the forum, the Court focuses "on the access sought by the speaker." *Corneli-*

*us*, 473 U.S. at 801, 105 S.Ct. at 3448. Although Warner, at times, sought access to a variety of courthouses, the challenged action occurred with reference to a particular courthouse. The Essex Courthouse is, therefore, the appropriate forum by which the Chief Justice's actions should be measured.

nizes that the Constitution does not require the government to "grant access to all who wish to exercise their right to free speech on every type of government property ...", *Cornelius v. NAACP Legal Defense & Ed. Fund*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1984), and that the government has the right "no less than a private owner of property, ... to preserve the property under its control for the use to which it is lawfully dedicated." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). However, the extent to which the government can exercise such control is dependant "on the nature of the relevant forum." *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. It is only when "the government opens facilities not generally available to the public that legal questions relating to equal access arise." *Gregoire v. Centennial School Dist.*, 907 F.2d 1366, 1370 (3d Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990).

The Supreme Court has defined three distinct types of fora. The first is the traditional public forum such as streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). In such a forum, the state may not exclude all speech and can only enforce a content-based exclusion if it is narrowly drawn and serves a "compelling state interest." *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980).

The second forum is public property "which the State has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. The Constitution governs the State's regulation of such property "even if it was not required to create the forum in the first place." *Id.*, (citing, *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting facilities); *City of Madison Joint School District v. Wisconsin Employment Relations Comm'n*,

429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theater)). In a "designated open public forum", *Gregoire*, 907 F.2d at 1370, the State is subject to the same standards that apply to a traditional public forum, that is content based prohibitions must be narrowly drawn to effectuate a compelling state interest. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955–56 (citing, *Widmar v. Vincent, supra*, 454 U.S. at 269–270, 102 S.Ct. at 274–275).

The third distinct forum is the "non-public forum." This is a publicly owned facility that has been "dedicated to use for either communicative or non-communicative purposes but ha[s] never been designated for indiscriminate expressive activity by the general public." *Gregoire*, 907 F.2d at 1371 (citing, *United States Postal Serv. v. Council of Greenburgh*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)). In this forum, "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *United States*, 453 U.S. at 131, n. 7, 101 S.Ct. at 2686, n. 7; *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451 ("Control over access to a non-public forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

It is important to note the distinction between content and viewpoint. Content refers to the topic or matter treated in a particular work. Viewpoint refers to one's opinion, judgment or position on that topic. Access to a non-public forum *can* be based on content and subject matter if the distinctions drawn are "reasonable in light of the purpose which the forum at issue serves." *Perry*, 460 U.S. at 49, 103 S.Ct. at 957. However, even in a non-public forum the state cannot regulate protected speech on the basis of its viewpoint. "Viewpoint discrimination ... is impermissible regardless

of the nature of the forum." *Student Coalition for Peace v. Lower Merion School,* 776 F.2d 431, 437 (3d Cir.1985) (citing, *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451). Indeed, the essence of the First Amendment is that the State cannot regulate speech "merely because public officials disapprove the speaker's views." *Niemotko v. Maryland,* 340 U.S. at 268, 282, 71 S.Ct. 328, 333, 95 L.Ed. 280 (1951) (Frankfurter, J., concurring in result).

It bares little discussion that the Essex County Courthouse is not a traditional public forum. Although it's corridors do, at times, resemble an open street or park, it has clearly not, from time immemorial, been held in trust for the purposes of assembly and the discussion of vital public questions. The court must, therefore, focus on whether it is a designated or nonpublic forum. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. The court has outlined a variety of factors which must be examined to ascertain the government's intent including the policy and practice of the government, *Id.,* the nature of the property, *Id.,* it's compatibility with expressive activity and the extent of the use granted. *Perry,* 460 U.S. at 46–47, 103 S.Ct. at 955–56. That is whether the facility is open to all or whether it has been limited by "well defined standards tied to the nature and function of the forum." *Gregoire,* 907 F.2d at 1371 (*citing, Perry,* 460 U.S. at 46–47, 103 S.Ct. at 1955–56). The court will not infer that a public forum has been created "when the nature of the property is inconsistent with expressive activity." *Cornelius.* The court is also "particularly reluctant to hold that the government intended to designate a public forum" where the principal "function of the property would be disrupted by expressive activity . . . ." *Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450; *see Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military reservation); *Adderly v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (jailhouse grounds).

The first inquiry concerns the state's and county's policy concerning the use of the Essex County Courthouse. According to the Chief Justice, the state had no "formal written policy" governing review of applications to use state courthouses for commercial filmmaking prior to 1988. After 1988 the Chief Justice instituted a "relatively consistent practice" concerning commercial filmmaking requests. The entire parameters of this practice or policy are embodied in a memorandum from the Administrative Director of the Courts, Robert Lipscher, to the County Assignment Judges. This memorandum provides, in its entirety:

> This memorandum is to memorialize the Chief Justice's request (made at the March 24, 1988 CJ/AJ Meeting) that neither the Assignment Judges nor any of the judges in their respective vicinage consent to the use of any courtrooms for commercial purposes by any profit-making entity without the Assignment Judge first having discussed it with the Chief Justice.

Although characterized as a "policy" the court finds that it is so vague and limited that it does not really constitute a policy or procedure under the case law. This fact is illustrated by contrasting the state's policy with that found relevant in *Cornelius.* There, the court considered it important that the Office of Personnel Management developed "extensive admission" criteria limiting access to the Combined Federal Campaign to "those organizations considered appropriate." The court thus found "no evidence suggesting that the granting of the requisite permission [was] merely ministerial". *Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450. Here the facts are far different. Prior to this action the state simply had no extensive procedure or policy analogous to that present in *Cornelius.*

The County also has no formal written policy governing commercial filmmaking requests. Rather, it provides film companies with a form application that does not in any respect reference the content of the particular film. The application outlines

the county's fee structure and asks the company to detail its time and space requirements. These facts suggest that there was, at both the state and county, an implicit policy that recognized the Essex County Courthouse as a limited public forum. The record on policy demonstrates that gaining access to state courthouses in general, and the Essex County Courthouse in particular, was purely ministerial. It is not essential, however, for the court to reach this conclusion by divining intention from the dearth of policy information. The case law establishes that both policy and practice are relevant to determine the government's intent. *Gregoire*, 907 F.2d at 1374 (citing, *Perry*, 460 U.S. at 37, 103 S.Ct. at 948; *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448–49). This is true because public forum classification "should be triggered by what" the parties do, not what they say. *See Board of Education v. Mergens*, — U.S. —, 110 S.Ct. 2356, 2369, 110 L.Ed.2d 191 (1990). Here, the practice of the State and County is crystal clear.

The record unequivocally demonstrates that the public has been given free access to the Essex County Courthouse for the purposes of commercial filmmaking. The productions filmed there include, She Devil, Rage of Angels, Rage of Angels II, Presumed Innocent, Invasion of Privacy, The Firm, Jacobs Ladder, 48 Hours, and the rap video entitled "L.L. Cool J.". Significantly, the first four productions were all filmed during the day while the court was in session. The record also unequivocally demonstrates that during Amato's tenure "the county [has] never denied access to the Essex County Court's complex for artistic productions." Although the Chief Justice indicates that the "majority but far from all requests made of the state judiciary to use state courthouses for filmmaking purposes received approval", he provides no evidence, data or other research to demonstrate that any production, other than the one at issue, was ever denied access to the relevant forum, the Essex County Courthouse.[9] Indeed, the record before the court demonstrates that no such denial ever occurred. The record as presented by the moving party is thus uncontradicted and compelling. It demonstrates that by practice, if not by implicit policy, both the County and the State intentionally treated the Courthouse as a designated public forum.

The court does not reach this conclusion lightly, or without recognition of the unique nature of a courthouse and its vital role in American government. The facts, however, compel such a finding. Access to this Courthouse has never been limited by well defined standards or by any concern relative to the judicial function of the forum. The productions filmed there range from the comic and irreverent ("She Devil"), to the topical (48 Hours), to the bizarre ("Jacobs's Ladder"), to the highly controversial and thought provoking (Rap Artist "L.L. Cool J.").[10] This case is thus an-

---

9. This case is thus readily distinguishable from *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1973). In *Lehman*, there "was uncontradicted testimony at the trial that during the 26 years of public operation, the Shaker Heights system, pursuant to City Council action, had not accepted or permitted *any* (emphasis in original) political or public issue advertising on its vehicles." Here, the contrary is true. There is uncontradicted testimony in the record that for the past eight years the County of Essex has *never* denied access to the Courthouse for the purposes of commercial filmmaking.

The case is also distinguishable from *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1982). There, the Supreme Court held unconstitutional a city ordinance making it unlawful to "parade, stand, or move in processions or assemblages in the Supreme Court

Building or grounds," or "to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement." The Court declared the statute unconstitutional as applied to expressive activity on the sidewalks surrounding the Court, but did not reach the issue of its application to the interior of the building. It is important, however, that the Court noted that the Supreme Court building has not been traditionally held open for expressive activity. *Id.* at 178, 103 S.Ct. at 1707–08. Again, the facts are different here because of the state's and county's conscious decision to open the Essex County Courthouse for expressive activity.

10. All of these productions can be accused of creating the same danger to the judiciary as the film at issue. She–Devil could be accused of treating religion in a blasphemous manner, Jacob's Ladder of portraying the Federal Govern-

alytically closer to *Widmar*, where the state university "generally" granted access to its facilities, than to *Cornelius*, where the government granted only "selective" access to the forum.

It is also important that specifically within the context of this particular film the defendant evidenced a clear intention to treat the Courthouse as a public forum. This is true because in April of 1990, knowing the content of the film and book, he granted a request from Warner to shoot an "innocuous" "walking" scene in the Courthouse hallway. After reviewing a second request by Warner, this time concerning the climactic "riot" scene, the Chief Justice denied permission. Nevertheless, on May 8, the Chief Justice conditionally granted Warner's third request to film a portion of the climactic riot scene in the Courthouse so long as Warner omitted from the scene filmed in Essex "the sequence in which the grate or fence is pulled down to restrain the mob." The point is that the defendant acknowledged the Courthouse as a limited public forum, one that was, albeit, subject to his editorial prerogatives. Having done so he assumed "an obligation to justify" "exclusions under applicable constitutional norms." *Widmar*, 454 U.S. at 267, 102 S.Ct. at 273. He could not arbitrarily exclude expressive activity without such action passing constitutional muster.

Analysis of the other factors periodically referenced by the Supreme Court supports this conclusion. The "nature" of the Courthouse, while not compatible with all expressive activity, is not incompatible with filmmaking. The record of the various productions and movies filmed in the Courthouse dramatically supports this finding. It is also clear that the principal function of the Courthouse is not disrupted by its periodic use for commercial filmmaking. Given reasonable time, place and manner restrictions, the judiciary can harmoniously coexist with any film crew. Such harmony can even be achieved, as in the case of Rage of Angels, Rage of Angels II, She Devil and Presumed Innocent, during the

day while the court is in session. Thus, the special considerations underpinning the court's holding in *Adderly* (prison security), and *Greer* (military training) are simply not present in this case.

On this point, the Chief Justice's reliance on *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1987) is totally misplaced. In *Hazelwood*, the school never evidenced an intention to open the pages of the school newspaper for "indiscriminate use" "by its student reporters and editors, or by the student body generally." *Id.* at 270, 108 S.Ct. at 569. Rather, it was reserved for its *intended* purpose as a supervised learning experience for journalism students. The case at hand is factually far removed because, as has been emphasized, the Courthouse has simply not been "reserved" for its intended primary purpose. *Hazelwood* is also distinguishable because of the fact that it concerned the First Amendment rights of students in a public school. Although students do not give up their rights when they enter school they are "not automatically coextensive with the rights of adults in other settings." *Id.* at 266, 108 S.Ct. at 567. The relationship of the principal to his students is simply not analogous to that of the Chief Justice to the entire court system and the public at large. Here, we deal with adults, in an adult setting.

## CONTENT ANALYSIS

■ Before addressing the question of whether the Chief Justice's action was based on content or viewpoint, the court will analyze his action as if it were content based. In a designated public forum a content based prohibition must be narrowly tailored to effectuate a compelling state interest. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955–56. Here, the Chief Justice argues that the need to maintain public confidence in the judiciary "and in particular, in the judiciary's sensitivity to the concerns of racial minorities—clearly represents a com-

ment in false and dangerous light, and the rap video of portraying various groups in grossly distorted and stereotyped fashions. It is diffi-

cult to discern, substantively, the great gulf between these productions and the Bonfire of The Vanities.

pelling state interest." He wrote, on October 18, that "confidence in the judiciary may be diminished because the judiciary has permitted such filming ... and so may the public's respect for courtrooms and courts and the underlying values they serve." Finally, in his brief he suggests that "there can be no serious dispute over the reasonableness of the [his] concerns about the judiciary's need to foster—or, perhaps more accurately, to avoid further eroding—the confidence of blacks and other minorities in the judicial system."

He also contends that his action was narrowly tailored because all he did was to deny Warner the use of a particular courtroom to film a particular controversial scene. The Chief Justice rejects the concept of disclaimers proposed by the Martin Committee. On this point, he wrote that "the identification of the judiciary with the Courthouse is so strong, the fact that ultimately, directly or indirectly, the judiciary controls the filming so well known and, in any event commonly believed, and the circumstances under which the public learns that the filming took place in a Courthouse so varied, that disclaimers are unlikely to avert the damage, or even substantially diminish it."

The court does not quarrel with the contention that the Chief Justice acted to effectuate what he perceived to be a desirable societal objective. Nevertheless, in this court's judgment, this objective is simply not constitutionally compelling. In order to satisfy this standard the interest pursued must be overwhelming and irresistibly mandated, it must be vital to the survival of the state. Perceptions of insensitivities and rumors of offense are simply not extraordinary interests such that they would justify abridgment of the most fundamental guarantee of the Bill of Rights. Freedom of Speech is too important to be so easily and cavalierly silenced.

Indeed, the irony of this case is readily apparent, for by acting to further his own concern for the welfare of the black community, this defendant egregiously trammelled a fundamental bulwark against the spread of government despotism. If it is true, as he suggests, that the black community lacks faith in the judiciary, it is difficult to understand how such a perception is combatted by modifying the First Amendment to eliminate from the category of protected speech any expressive activity or portrayal objectionable to that community. It is difficult to understand how the confidence of the public as a whole is maintained when the judiciary seems so willing to selectively apply constitutional rights according to the perceived sensitivities of any one group. It seems self evident that the essence of the First Amendment is not that it protects speech acceptable to the understandings and values of government decision makers, or to any particular politically active group, but that it protects speech that is controversial and at times politically offensive.[11] The survival of a vital democracy is dependant upon the citizenry's free and unimpeded access to such speech.

This is not to suggest that the judiciary does not have legitimate interests in this area, or that Constitutional principles should be coldly applied, divorced from concern for the oppressed and less fortunate. Surely they can not be. But just as a judiciary must always be informed by compassion it must also be constantly reminded that equality under the law does not always compel us to act as we as individuals adjudge to be morally or subjectively correct. Ideally the law should be just as ignorant of the prejudices of those who apply it, as it should be from those whom are judged. Here the defendant ignored these precepts by placing the personal interests of policy, symbol and perception above principle. He misconstrued the function and importance of the judiciary with the physical trappings surrounding it. A courthouse is merely a structure of bricks and mortar. It has no intrinsic judicial or constitutional importance for the simple reason that the quality of justice is neither measured by the location of where it is

---

11. This case does not address the question of the propriety of the judiciary banning all pornographic filming in the Courthouse. Such a case raises different issues and, importantly, different legal principles.

dispensed nor by the accuracy with which it is portrayed in film. A courthouse is important only because of the meaning and life the judiciary breaths into the principles of the constitution within its confines. These principles are debased when they are subject to modification according to one man's subjective assessments more so than when the bricks and mortar serve as a public forum for any expressive activity. Simply stated, the symbol cannot be more important than the principle. Indeed, it is only through the uniform application of neutral principles that the Constitution's promise of equality for all can be attained.

The defendant's proffered reason is also not compelling because it rejects the principles of equality inherent in the First Amendment. In *Police Department of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1971) Justice Marshall appropriately wrote:

[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

Here, the Chief Justice violated this principle by plainly and simply censoring this activity because he found it unacceptable and controversial. He prevented the filming solely based on his objection to what the filmmaker intended to say and the fear that such a viewpoint would reflect poorly upon the judiciary. This is nothing more than an attempt to bolster the reputation of the Court by infringing upon the constitutional rights of others. Such selective enforcement of constitutional protections must be strongly rejected.

Moreover, even if there were a correlation between the judiciary and the black communities' perception of judicial insensitivity, such an interest can be furthered by far narrower means than the method chosen. Such a method, as suggested by the Martin Committee, would be the use of disclaimers. While the Chief Justice is correct to argue that the effect of such disclaimers is subject to debate, this argument can be made with respect to any method employed short of banning all filming in the Courthouse. In this case, the forum was not closed to expressive activity and the Chief Justice was, therefore, bound by constitutional imperative to restrict access according to the narrowest possible means. A disclaimer would have satisfied this standard. It has the decided benefit of clearly and unambiguously proclaiming the judiciary's independence from the film's content or viewpoint without raising the very questions at issue in this litigation.

Finally, it should be noted that the Chief Justice's method of effectuating the alleged compelling interest is logically difficult to understand because of the nature of the expressive activity involved. In this case, he gave permission for Warner to film an innocuous "walking" scene in the Courthouse. He would also have permitted the filming of a scene portraying the Judge and McCoy escaping the rioting mob. He would not, however, permit the "dangerous" scene of blacks rioting in a courtroom to be filmed in Essex County. The irony is that in a motion picture these scenes would flow into a continuous whole in such a way that it would be impossible to ascertain that the dangerous scene was not filmed in the same location as the innocuous scene. The danger that the public's confidence in the judiciary will be diminished is thus not eliminated simply by excising the "dangerous" scene. Although the defendant would argue that this analysis is flawed because the public would know that he did not *expressly* grant permission to use the Courthouse for this scene, such an argument fails to recognize the very essence of

his objection in the first instance, that is the *perception* of insensitivity. That perception is not ameliorated by selectively "endorsing" certain scenes of a film any more so than it is by endorsing a particular political candidate for elective office. It seems that if the public's perception of the judiciary's treatment of minorities can be so easily swayed, it would make little difference that in reality the objectionable scene was filmed in Burbank rather than Essex.

There is also nothing in the record to support the assertion that permitting this scene to be filmed in a New Jersey Courthouse would cause justifiable offense in the black community. There is nothing in the record except the Chief Justice's bald assertions and fears. Two points must be stressed. In order to satisfy a compelling constitutional standard the state is obligated to demonstrate all facets of its position. It must demonstrate that its policy rests on firm factual ground. The requirements of the constitution are not met with mere speculation. The Chief Justice's argument can also be reduced to the truism that cinematic portrayals of violence reflect poorly upon the perpetrators. The court holds this truth to be self evident. Such a conclusion, however, without more, is an insufficient basis for censoring a protected expressive activity in a public forum. If this were the appropriate standard to censor speech, all violent portrayals would be banned because they reflect poorly upon the perpetrator and, correspondingly, the vast majority of law abiding citizens, be they white, black, Catholic, Jewish, Italian or Armenian, who are members of the perpetrators racial or ethnic group. It cannot be seriously argued that cinematic violence can be censored *per se.*

On this point, it is again appropriate to address *Hazelwood* and the Chief Justice's argument concerning abridgement and "non sponsorship." The Chief Justice contends that if he permitted the filming of this scene the black public could legitimately question the judiciary's sensitivities to minority concerns. Analytically, this position rests on the assumption that the public would believe that the judiciary sponsored the viewpoints expressed in the film. He concludes that the State, like the school in *Hazelwood,* has no constitutional obligation to sponsor protected speech if its decision is reasonable and solely based on content. This analogy misses the mark. In *Hazelwood,* the link between the expressive medium, the newspaper, and the school, was direct. The school published the newspaper and its name was inextricably associated with the school. Given these facts and the special considerations of the setting, the school had the right to exercise editorial control over the paper's content. Here, the connection between the medium, its message, and the judiciary is far more attenuated.[12] Allowing the Courthouse to be used as a forum for expressive activity does not create such an inextricable link that the Chief Justice would be viewed as the film's producer or sponsor. This argument rests on a leap of imagination the Court is unwilling to take, particularly considering that the great majority of the public would not even recognize the Essex County Courthouse as the fictional courtroom of the film.

## VIEWPOINT

■ The Court's conclusion that the Chief Justice's action was not narrowly tailored to serve a compelling state interest is not, however, essential to the resolution of this case. This is true because the Chief Justice's action constitutes suppression of speech because of its viewpoint. As has been stated, such abridgment is unconstitutional, irrespective of the forum. The best evidence that the Chief Justice's action was based on viewpoint rather than content are his own words. He wrote: "If called upon to explain why I had approved the use of the state judiciary's facilities and resources—the use of a courtroom—for a private, commercial film showing blacks acting in violent and flagrant disrespect for

---

**12.** *Hazelwood* would, however, clearly apply if the Supreme Court commissioned, produced or

directed its own motion picture.

the rule of law—indeed, for the specific purpose of filming a scene that depicted blacks in the worst possible stereotype—I could think of no adequate response." Here, the Chief Justice fails to distinguish the content of the film and scene from its viewpoint. The film is not about, nor is it designed to document rioting blacks any more so than it is designed to malign drunken English reporters or greedy philandering white men. The scene in question certainly shows blacks rioting but that is not the same thing as saying that the subject matter of the scene or film is rioting blacks or drunken reporters. The content of the scene in question was a judicial proceeding watched by an audience predominantly composed of blacks. Its viewpoint was to present this audience in a riotous manner after an indictment is dismissed against the white defendant. The Chief Justice acted because he objected to the filmmaker's presentation of the topic. This fact is also illustrated by the Chief Justice's decision regarding the "escape" scene. After having given permission to Warner to film an innocuous scene, and preventing them from filming the riot scene, he gave Warner permission to film an escape so long as it did not show "a mob of blacks rioting in the Courthouse...." To summarize, the Chief Justice permitted the filming of the first part of the scene, banned entirely the second part of the scene because of its viewpoint and edited to his point of view the third scene. Such censorship is offensive to the principles of the First Amendment and unconstitutional.

## IMMUNITIES

■ The court now addresses the defendant's argument that he is immune from a damage judgment under the Eleventh Amendment and pursuant to principles of judicial and qualified good faith immunity. The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This language has consistently been interpreted to bar suits for money damages by private parties in federal court against the state or state agencies. See *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 17, 87 L.Ed.2d 114 (1985); *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). It also bars suits for money damages against state officials in their official capacity because "the state is the real party in interest inasmuch as the plaintiff seeks recovery from the state treasury." *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir.1990) (*citing, Graham*, 473 U.S. at 165–166, 105 S.Ct. at 3104–3105). Nevertheless, when the suit is against the state official in his or her personal capacity, and seeks recovery from the individual's personal assets, the state is not the real party in interest and the Eleventh Amendment does not bar the suit. *Graham*, 473 U.S. at 165–168, 105 S.Ct. at 3104–3106.

In this case, Wilentz is sued in both his individual and official capacity. The Complaint alleges that his actions "constitute an illegal deprivation of plaintiffs' rights under color of state law." The Complaint also clearly seeks damages against his personal assets and not those of the state. As noted in *Hafer*, the Supreme Court's cases expressly demonstrate that individual capacity suits may be brought against government officials who acted under color of state law. *Hafer*, 912 F.2d at 637 (*citing, Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). Such is the case here. The defendant is charged with acting under color of state law to deprive Warner of rights secured by the First Amendment. Defendant's argument that any damage judgment would be paid by the state pursuant to N.J.S.A. 2A:1–8, is unpersuasive. This statute states that expenses incurred by "order of the Supreme Court in the execution of its duties ..." will be paid by the state. Here, the Chief Justice's action was not taken by order of the Supreme Court or by the Supreme Court at all. Rather, he acted individually in his capacity as administrative head of

the courts. The Eleventh Amendment does not bar this action.

■ The Chief Justice next argues that principles of judicial immunity bar the plaintiffs' claim for damages. It is true, as the defendant argues, that "Few doctrines [are] more solidly established ... than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction...." *Pierson v. Ray*, 386 U.S. 547, 553–554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1966) (*citing, Bradley v. Fisher*, 13 Wall 335, 20 L.Ed. 646 (1872)). This immunity applies "even when the judge is accused of acting maliciously and corruptly." *Pierson*, 386 U.S. at 554, 87 S.Ct. at 1217–18. Furthermore, judicial immunity does not exist "for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Bradley*, 13 Wall at 349 (*citing, Scott v. Stansfield*, L.R. 3 Ex. 220, 223 (1868)). It is not true, however, that simply because the defendant in this action is a Judge, he is *ipso facto* entitled to absolute judicial immunity. As with all well accepted doctrines there are exceptions to this one.

In *Forrester v. White*, 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1987) the Court explained that for the purposes of judicial immunity there is an "intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." The court indicated that "Administrative decisions, even though they may be essential to the very functioning of the courts, have not ... been regarded as judicial acts." and, as such, do not give rise to absolute immunity from liability in damages under § 1983. The court's analysis is particularly appropriate in this case. Justice O'Connor wrote:

> In the case before us, we think it clear that Judge White was acting in an administrative capacity when he demoted and discharged Forrester. Those acts—like many others involved in supervising

court employees and *overseeing the efficient operation of a court* (emphasis added)—may have been quite important in providing the necessary conditions of a sound adjudicative system. The decisions at issue, however, were not themselves judicial or adjudicative. As Judge Posner pointed out below, a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other executive branch official who is responsible for making such employment decisions. Such decisions, like personnel decisions made by judges, are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983.

This analysis is persuasive. Absolute immunity is "strong medicine, justified only when the danger" of deflecting a judge from performance of his duties "is very great." *Forrester*, 484 U.S. at 230, 108 S.Ct. at 546 (*citing, Forrester v. White*, 792 F.2d 647, 660 (7th Cir.1986) (Posner, J., dissenting)). Here such danger is not present. The conduct at issue was not a judicial act performed pursuant to the defendant's adjudicative function. It was a supremely administrative act governing the after hours use of a building. Its character was more in the nature of licensing or scheduling than in the nature of a judicial act. This analysis is not changed by the fact that the Chief Justice was acting to further what he perceived to be important judicial and societal objectives. The essential nature of the act is not altered by its penumbra. As such the court finds that the Chief Justice does not have absolute judicial immunity for acts taken in his administrative capacity as head of the courts.

■ The Chief Justice also argues that he is protected from liability pursuant to the doctrine of qualified good faith immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800, 818–819, 102 S.Ct. 2727, 2738–2739, 73 L.Ed.2d 396 (1982) the court explained the parameters of this doctrine. The court

wrote that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Citing, Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975).[13] However "if the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The court stressed that the inquiry should focus on the objective reasonableness of the official's conduct in reference to clearly established law. *Id.* at 818, 102 S.Ct. at 2738. "Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." *Id.* at 819, 102 S.Ct. at 2738. Such factors are present in this case.

Although the plaintiffs strenuously argue that the issues presented by this case are clearly established and easily decided, the facts do not sustain such an interpretation. This case cannot simply be reduced to the principle that viewpoint discrimination is unconstitutional. Such a principle of law is well established. It was not clear or well established, however, that such a principle of law would apply to the unique facts of this case. There are simply too many grey areas, both procedural and substantive, for this court to conclude that the Chief Justice's action violated "clearly established" law. This defendant acted in uncharted constitutional waters and is thus entitled to be protected by the principles of qualified immunity.

## REMEDY

The court now turns to the final aspect of the case, fashioning an appropriate remedy. The conduct at issue violated the First Amendment and a declaratory judgment will be issued. The court is unconvinced, however, of the need to issue injunctive relief. There are two reasons for this holding. First, there has not been a strong showing of irreparable injury. Although in this case the defendant is clothed with immunity the same would not be true in the future. This court's clear holding on this issue sets forth sufficient guideposts so that any analogous conduct would violate clearly established law. Monetary relief would, therefore, be available for an aggrieved plaintiff. Second, the defendant has voluntarily ended his own content review of film applications. Although the court has found that the case is not moot because there is a likelihood of repetition, analysis of mootness should be kept distinct from the court's analysis of the appropriateness of equitable relief. *See City of Mesquite,* 455 U.S. at 289, 102 S.Ct. at 1074–75. Here, the plaintiff has demonstrated a likelihood of repetition but has not met the higher burden of demonstrating the need for the extraordinary remedy of permanent injunctive relief. As such, an injunction will not be issued. It is also true that under traditional principles an injunction must be narrowly tailored to address a specific harm. Here, the court would have great difficulty fashioning such a narrow prohibition. Indeed, in this case, any injunction would be so broad that it could be reduced to the principle that the Chief Justice cannot violate the Constitution. Such a broad and superfluous injunction serves no legitimate purpose and should not, therefore, be issued.

This holding should not suggest, however, that the court condones the defendant's action or ignores the negative im-

---

**13.** In Footnote 30, the court indicated that *Harlow* did not concern the immunity available to state officials sued for constitutional violations under 42 U.S.C. § 1983. The court noted, however, that it previously recognized that it was "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought

directly under the Constitution against federal officials." *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978). Moreover, the principles of qualified immunity enunciated in *Harlow* were made applicable to judges in *Forrester,* 484 U.S. at 230, 108 S.Ct. at 546.

pact it has had on the legislature's salutary policy of promoting filmmaking in New Jersey. To the contrary, it is only by strongly censoring the censor that the rightful balance between the legislature, the organ of state public policy, and the judiciary can be restored. The court does not reach this conclusion lightly without recognition of the sensitive and unique issues of federalism and comity raised by this case. It does not reach this conclusion without recognition of the defendant's position and legitimate interest, as administrative head of the courts, in assuring the smooth and just operation of the state courts. But this court is equally cognizant of its constitutional obligation to apply the law uniformly to all litigants irrespective of their positions, irrespective of the subjective difficulties of any one case. In *United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1973) the Supreme Court held that a President's interest in confidentiality cannot prevail over the fundamental demands of due process of law and the fair administration of justice. This holding was in essence a recognition that, in a democracy, no man is above the law. So too here.

SO ORDERED.